## HAROLD R. SPAINHOUR

### V.

## B. AUBREY HUFFMAN & ASSOCIATES, LTD.

Record No. 861164

March 3, 1989

Present: All the Justices

*Dabney Overton, Jr.* for appellant.
*Larry J. McElwain (Paxson, Smith, Gilliam & Scott*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

This is a dispute between a landowner and a surveyor employed to make a boundary survey. Contending that the survey was negligently performed, the landowner refused to pay the surveyor's fee in full. When the surveyor sued in general district court for the unpaid balance, the landowner removed the case to the circuit court, denied liability, and counterclaimed for damages arising from the surveyor's alleged negligence. At a jury trial, the surveyor prevailed, receiving a verdict for the balance of his fee and a finding in his favor on the landowner's counterclaim. We awarded the landowner an appeal from a judgment entered on the verdict. On appeal, the controlling issue is whether the surveyor was negligent as a matter of law.

The essential facts are undisputed. In 1982, Harold R. Spainhour owned a tract of land in southwestern Albemarle County containing approximately 32.5 acres. This tract had been assembled from several sources. One of its constituent parts was a small parcel containing approximately 0.5 acre lying north of State Route 693. This half-acre parcel, the subject of the present controversy, had been carved out of a larger tract containing approximately 11.1 acres, which had formerly belonged to George Craig. West of the half-acre parcel lay a tract formerly belonging to the trustees of a Mormon church. The church building no longer exists, and the former church lot now belongs to Davy L. Thacker. Thacker erected a house on the lot which Spainhour thought was very close to, or encroaching upon, the line dividing Thacker's "church lot" from Spainhour's half-acre parcel.

A 1907 recorded deed in the chain of title to the 11.1-acre parent tract contained a metes-and-bounds description which began as follows: "Beginning at a stone on a ridge near Mormon Church thence N. 54 E. 8 8/10 poles to a chestnut a corner to S.E. Pugh and S.R. Kirby, thence . . . ." By 1982, the "stone on a ridge near Mormon Church" could not be found. The physical evidence suggested that the ridge had been graded down in connection with the construction of the Thacker house, probably resulting in removal of the stone.

It was conceded by all parties, however, that the other end of the beginning course described in the 1907 deed was monumented. The evidence disclosed that the area had been widely grown with chestnut trees in the early part of the present century, but that all had been killed by the chestnut blight in the 1920's and 1930's. Many of their stumps remain, however, and, being particularly durable, are still visible. Several adjoining landowners had, for many years, considered a very large chestnut stump to be the remains of the "chestnut a corner to S.E. Pugh and S.R. Kirby" described as the end of the beginning course recited in the 1907 deed. One of the adjacent owners had, years earlier, accepted the stump as his boundary to his detriment, because it fell some 15 feet within his property lines as measured from other monuments. There were no other chestnut stumps in the vicinity. For those reasons, a succession of surveyors working on adjacent tracts over the years accepted the chestnut stump as monumentation of the corner described in the 1907 deed. One of the earlier

surveyors had driven an iron pipe into the stump to fix the exact corner point.

Spainhour believed that by beginning at the chestnut stump and running the distance, 8 8/10 poles (145.2 feet)[1], along the reciprocal of the course (N. 54 E.) called for in the 1907 deed, a surveyor could establish the original location of the "stone on the ridge near Mormon church" which had marked the beginning point of the 1907 description. That point would mark the corner common to the half-acre parcel and Thacker's lot. By running a line from that corner to other monuments, Spainhour hoped to fix his boundary with Thacker.

In 1982, Spainhour engaged B. Aubrey Huffman & Associates, Ltd. (Huffman), a firm engaged in civil engineering and land surveying in the Charlottesville-Albemarle area to make a boundary survey. Huffman's principal officer and sole stockholder was Arthur F. Edwards, a certified land surveyor. Edwards explained to Spainhour that a reliable result could not be achieved by establishing a single point and running the line from it. Edwards' opinion was that it would be necessary to survey the entire Spainhour property in order to establish the boundary to an acceptable degree of accuracy. Spainhour agreed and authorized the survey.

Edwards checked the land records, sent out a survey party under another certified land surveyor to do the field work, examined the field notes, and prepared a plat which was furnished to Spainhour along with Huffman's bill for services in the amount of $2,341.25.

Spainhour was dissatisfied with the Huffman plat. Although Huffman accepted the pipe in the chestnut stump as a monument, the plat ran the line from that pipe toward Thacker 132.40 feet rather than 145.2 feet as called for by the 1907 deed. The resulting Spainhour-Thacker boundary fell 13 feet farther from Thacker's house than Spainhour thought it should. Spainhour paid $1,100 on Huffman's bill but refused to pay the balance.

In 1984, Spainhour engaged J.W. Clark, a certified land surveyor in Augusta County, to survey the half-acre parcel which adjoined Thacker. Clark did not find it necessary to resurvey all of

[1] A pole, as a surveyor's unit of measurement, is one-fourth of a surveyor's, or Gunter's chain. Gunter's chain, named for Edmund Gunter (d. 1626), is 66 feet long and consists of 100 links, each 7.92 inches in length. A pole is therefore 16.5 feet in length. 8.8' X 16.5' = 145.2'.

Spainhour's 32.5 acre tract, but did survey the boundaries of the original 11.1-acre parent tract out of which the half-acre parcel had been carved.

Clark found monuments along the boundaries of the 11.1-acre tract which he related to more recent recorded surveys of adjoining lands. The courses and distances he obtained confirmed, with a reasonable degree of accuracy, that the pipe in the chestnut stump was indeed the corner described in the 1907 description. He applied the reciprocal of the 1907 course which had ended at that corner, ran the distance of 145.2 feet called for in the 1907 deed, and established the beginning point of the 1907 deed which formed one end of the disputed boundary. This resulted in a line which barely missed Thacker's house, but passed through a concrete pad at the foot of Thacker's rear steps.

In the process of his field work, Clark found the iron spikes set by Huffman and left them in place. Clark placed his own spikes at the points he thought correct, and prepared a plat of the half-acre parcel and its parent tract which showed, in addition to his own lines, the lines established by Huffman with which he disagreed. A part of Clark's plat, showing both versions of the disputed boundaries of the half-acre parcel, is appended to this opinion.

At trial, the cause of the disagreement between surveyors became apparent. Edwards, Huffman's surveyor, had disregarded the 145.2 foot distance called for by the 1907 deed for two reasons. First, measuring that distance from the pipe in the chestnut stump brought him to a point which established a boundary line which did not agree with the alignment of an old fence he found across Route 693. Although the fence was not mentioned in any description of record, and had a "bow" in it, it showed signs of such antiquity that Edwards concluded that it had been accepted as a boundary between the parent 11.1-acre tract and the former Mormon church lot. By extending the line of the fence across the road to the point of its intersection with the reciprocal of the course to the pipe in the chestnut stump as called for the 1907 deed, he arrived at his conclusion concerning the 1907 beginning point.

Edwards' second reason for disregarding the 145.2-foot distance call related to acreage. When the 145.2-foot distance was entered into Edwards' computer along with the other courses and distances established for the boundaries of the parent 11.1-acre tract, the computer reported that the parent tract had actually con-

tained only 10.73 acres. He testified, "[e]ither the acreage number on there is wrong or some or one or all of the courses and distances called for on that description have something wrong with it." Accordingly, he testified, he relied on the extension of the fence line he observed in the field rather than the recorded distance call. The result gave him a distance of 132.40 feet rather than the 145.2 feet called for by the deed. Entered into the computer, the shorter line yielded an acreage for the parent tract that was closer to the 11.1 acres of record.

Clark testified, as did other certified land surveyors who appeared as witnesses, that modern surveyor's techniques have resulted in greatly improved accuracy in recent years. When surveyors formerly employed the magnetic compass to establish courses, the result varied from year to year due to changes in magnetic variation, resulting from the constantly changing deflection of the lines of magnetic force around the earth. While this variation could be computed from published tables, local deviation caused by the magnetic attraction of ferrous metals in the earth and rocks was entirely unpredictable. The evidence was that boulders in western Albemarle County were particular sources of such magnetic disturbances. Further, surveyors presently compute their courses and distances in a theoretical horizontal plane. Older measurements were made by survey parties hauling their chains up hill and down dale. The net result is that recent surveys frequently disagree with older surveys of the same property; courses may differ substantially, modern distances may be shorter if the terrain is rough, and computed acreage will frequently be less in a modern description than in an older one.

Notwithstanding these improvements in technology, all the surveyors who testified, including Clark and Edwards, agreed that the hierarchy of reliability among the surveyor's measurements remains the same. When measurements conflict, monuments are the most reliable guides; they prevail over distances, courses, and acreage. Courses, formerly dependent upon the vagaries of the magnetic compass, and distances, formerly measured by the use of Gunter's chain, come next. Acreage, based upon mathematic computation from courses and distances, and subject to the sum of all the errors in them, is the least reliable measurement.

The case was tried as an action for professional malpractice. Clark's opinion was that Huffman had erred in disregarding a recorded distance, relying on an unrecorded fence line observed in

the field, and depending on an acreage computation. Expert witnesses called by Huffman opined that Huffman's methods met the locally prevailing standards of skill, care, and diligence. At the conclusion of Huffman's evidence, and again at the conclusion of all the evidence, Spainhour unsuccessfully moved the court to strike Huffman's evidence and to enter summary judgment on the issue of liability in Spainhour's favor on his counterclaim, on the theory that Huffman had been negligent as a matter of law. Denying these motions, the court submitted the case to the jury with an instruction that Huffman's duty was "to possess and exercise such reasonable and ordinary skill, care and diligence as are ordinarily exercised by the average of the members of his profession in good standing, in the Charlottesville/Albemarle County area . . . ." Spainhour objected to the instruction.

 In our view, the court erred in denying Spainhour's motions and submitting the case to the jury. Professionals charged with negligence are ordinarily entitled to be judged by the standard of care prevailing in their profession at the appropriate time and place. This necessitates the expert testimony of fellow professionals, familiar with the standard, to explain it to the fact-finder. The question whether the professional departed from the standard is ordinarily an issue of fact, to be resolved on the basis of conflicting expert testimony, but exceptions exist which have become rules of law. *See, e.g., State Farm Mutual Auto Ins.* v. *Floyd*, 235 Va. 136, 144, 366 S.E.2d 93, 97 (1988) (attorney has legal duty to convey settlement offer to client); *Va. Real Estate Comm.* v. *Bias*, 226 Va. 264, 269-70, 308 S.E.2d 123, 126 (1983) (broker has absolute duty to convey offer promptly to seller). Such exceptions fix binding standards which are not left to the exercise of professional judgment. Being rules of law, they are not subject to expert opinions expounding local practices.

 Land surveyors, like other professionals, are governed by certain standards which have ripened into rules of law. In the absence of evidence of contrary intent, a distinct order of preference governs inconsistencies in the description of land:

1. natural monuments or landmarks;
2. artificial monuments and established lines, marked or surveyed;
3. adjacent boundaries or lines of adjoining tracts;

4. calls for courses and distances;[2]

5. designation of quantity.

*Providence* v. *United Va./Seaboard Nat.*, 219 Va. 735, 745, 251 S.E.2d 474, 479 (1979). The foregoing rule is not inflexible, and will not be applied if to do so will frustrate the intent of the parties to the deed, *id.*, 251 S.E.2d at 480, but in the present case there was no evidence of the intent of the parties to the crucial 1907 deed other than its language. Accordingly, the foregoing order of preference governs the case.

■ The chestnut stump in which a pipe had been set was accepted by all concerned as a natural monument, meeting the criteria of the first category above. The course running to or from it was not in controversy. The sole question for the surveyor was whether the distance recorded in the 1907 deed should prevail over the inconsistent measurement of acreage. On that point, the rule is clear. "Quantity is regarded as the least certain mode of describing land, and hence must yield to description by boundaries and distances." *Reid* v. *Rhodes*, 106 Va. 701, 707, 56 S.E. 722, 724 (1907) (quoting *Hunter* v. *Hume*, 88 Va. 24, 29, 13 S.E. 305, 307 (1891)). The extension of the fence line on which Huffman relied, being neither marked nor surveyed, and being unrelated to any monument described of record, fails to meet the criteria of "artificial monuments and established lines, marked or surveyed," the second category above. The recorded distance should have prevailed.

■ We conclude that Huffman was negligent as a matter of law, and that the court erred in denying Spainhour's motions to strike and to grant summary judgment on the issue of liability. Accordingly, we will reverse the judgment, enter final judgment in Spainhour's favor with respect to Huffman's claim, enter judgment on the issue of liability in Spainhour's favor with respect to Spainhour's counterclaim, and remand the case for trial of the issue of damages on the counterclaim.

*Reversed and remanded.*

---

[2] Minor suggests that where the conflict is between courses and distances, courses should prevail because they were presumably set by the more experienced surveyor using a compass, while the distances were measured by the less experienced chain carriers. F. Ribble, 2 Minor on Real Property, § 1076 (2d ed. 1928).