## SEAWARD INTERNATIONAL, INC., ET AL.

## V.

## PRICE WATERHOUSE

Record No. 891137

April 20, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting, and Hassell, JJ.,
and Cochran, Retired Justice

*T. Jay Barrymore (Carolyn J. Harvey; Jones, Day, Reavis & Pogue*, on briefs), for appellants.

*John J. Sabourin, Jr. (Charles F.B. McAleer, Jr.; Hazel, Thomas, Fiske, Beckhorn & Hanes*, on brief), for appellee.

JUSTICE RUSSELL delivered the opinion of the Court.

This is an action for professional malpractice brought by corporate clients against an accounting firm. At a jury trial, the defendant moved to strike the plaintiffs' evidence at the close of the plaintiffs' case and renewed the motion at the close of all the evidence. On both occasions, the court took the motion under consid-

eration. The case was submitted to the jury, which returned a verdict in favor of the plaintiffs. After verdict, the court sustained the motion to strike, set the verdict aside, and entered final judgment for the defendant. On appeal, the sole question is whether the evidence was sufficient to create a jury issue. We conclude from the record that the evidence was insufficient, and affirm.

■ When a plaintiff's verdict has been set aside by the trial court, it is not entitled to the same weight as one approved by the trial court. On appellate review in these circumstances, however, the plaintiff is entitled to the benefit of all "substantial conflicts in the evidence and all reasonable inferences that may be drawn from the evidence." *Kelly* v. *Virginia Power*, 238 Va. 32, 34-35, 381 S.E.2d 219, 220 (1989) (citations omitted). We will consider the evidence in that light.

Seaward International, Inc. (Seaward), is engaged in the sale of fenders, buoys, and other marine supplies, some of which are sold to foreign markets. In 1978, in order to encourage exports, federal legislation permitted the deferral of taxes on export sales made by certain qualifying wholly-owned subsidiaries of exporters, known as domestic international sales corporations (DISC). See *Commonwealth* v. *General Electric Company*, 236 Va. 54, 372 S.E.2d 599 (1988). In 1978, Seaward formed Seaward International Sales Corporation (SISC), a wholly-owned subsidiary, to take advantage of the tax-deferral provisions of the federal law. Like most DISCs, SISC was essentially a shell corporation, having no employees.

Price Waterhouse (PW), a partnership having over 1700 partners, is engaged in the practice of professional accountancy. Seaward engaged PW to audit the consolidated financial statements of both Seaward and SISC for Seaward's fiscal year ending July 31, 1983.[1] PW agreed to undertake the audit by a letter dated June 10, 1983, which contained the following terms:

> Our examination will be conducted in accordance with generally accepted auditing standards, and accordingly will include such tests of the accounting records and such other

---

[1] The fiscal year of SISC ended on August 31, 1983, one month later than that of the parent corporation. Seaward contends that the purpose of this difference was to provide a time during which SISC could be brought into conformity with federal law if the audit should show that it was falling short of the annual prerequisites necessary to qualify for tax deferral.

auditing procedures as we consider necessary in the circumstances. This examination, however, will not include a detailed audit of transactions such as would normally be required to disclose defalcations or other irregularities.

PW points out that it was not engaged to prepare financial statements or tax returns for either Seaward or SISC; those functions were to be performed entirely by Seaward's employees. Further, PW was not engaged to provide tax advice. Seaward originally charged PW with negligence in that regard, but the trial court granted summary judgment in PW's favor on those allegations, and that ruling was not appealed.

The prerequisites for tax deferral were complex. If a DISC failed to meet those requirements in any fiscal year, it would lose its status as a "qualified DISC" for that year and would confer no tax benefits upon its parent corporation. One of the prerequisites for tax deferral was a requirement that 95% of a DISC's assets at the end of a fiscal year must be "qualified export assets" (the QEA test). Qualified export assets could consist of, among other things, foreign accounts receivable, "producer's loans" from the parent corporation, and "export-import obligations." Seaward contends that a primary purpose of the audit was to verify the work of its own employees, to insure that SISC would meet the QEA test by the end of its fiscal year, and to obtain timely warning if it was falling short of the DISC requirements so that the fault could be rectified.[2]

PW began its work about June 20, 1983. Its employees engaged in field work at Seaward's offices, examined Seaward's physical inventory on July 31, and conducted "year-end" field work in September. On October 6, PW issued its audit report, declaring that the financial statements Seaward had prepared "present fairly the financial position of [Seaward and SISC] at July 31, 1983 . . . in conformity with generally accepted accounting principles consistently applied."

Seaward's comptroller, William B. Bryan, a certified public accountant, had reported to PW that SISC met the QEA test for the fiscal year, and it is undisputed that he furnished backup information to PW which substantiated his representation. PW's

---

[2] The witnesses agreed that action could be taken during some indeterminate period of time after the close of the fiscal year in order to bring a DISC into compliance, although they disagreed as to the amount of leeway available.

field work revealed no cause to dispute that assertion, and PW's report therefore reinforced the conclusion, reached by Seaward's employees, that SISC met the QEA test for the 1983 fiscal year. Accordingly, Seaward's comptroller prepared a tax return for SISC, which Seaward's president approved, signed, and filed in the spring of 1984, which represented that SISC met the QEA test as of August 31, 1983.

In April 1985, an agent of the Internal Revenue Service (IRS), reviewing SISC's tax returns, concluded that SISC had failed to meet the QEA test for the 1983 fiscal year. Judith McCune, who had replaced Mr. Bryan as Seaward's comptroller, went over such records as were available in 1985, and agreed with the IRS agent. Ultimately, Seaward negotiated a settlement with the IRS, evidenced by a "closing agreement" in June 1986, in which Seaward incurred a substantial additional tax liability. Seaward and SISC brought this action against PW, seeking to recover their losses on both tort and contract theories.

At trial, Seaward relied on the testimony of Chris Turner, a certified public accountant, who qualified as an expert witness. With regard to the applicable standard of care, she testified:

> if you as a CPA are going to issue an opinion on financial statements, you have to have a basis for that opinion. You have to get evidence to support it. If you don't get that evidence, you can't issue an opinion. If you don't get the evidence and issue an opinion anyway, then you haven't met the standards.

The witness also testified that an accountant must ask for "management representations — asking the company. But ⁚ . . management representations by themselves are not enough evidence to issue an opinion on financial statements."

Chris Turner was Seaward's only witness with respect to the standard of care and PW's alleged departure from that standard. She expressed the opinion that PW had been negligent in failing to investigate Seaward's records in sufficient depth to discover that Mr. Bryan's QEA calculations were incorrect. The ultimate issue in the case is whether records existed in 1983, which if PW had examined them, would have revealed that Mr. Bryan was in error.

Chris Turner, when asked what documents she had examined as a predicate for her opinion, said, "Well, there were a couple of

copies of documents which were produced and copied and I looked at all of them. That included Price Waterhouse's work papers for various years." She also stated that she had reviewed the applicable professional standards and the tax rules governing DISCs, had read several depositions, and had listened to the testimony of other witnesses. Later, she testified that she had "looked at two cartons worth of documents" consisting of PW's "work papers." But throughout, her testimony fell short of identifying any particular documents or other evidence which would have revealed Mr. Bryan's error to PW in 1983. The jury was left to speculate whether any such evidence had in fact existed at that time.

The expert testified that PW had requested and received schedules relating to SISC's qualified export receipts, and that they had been verified. She concluded, however, that PW had not asked for "anything related to the assets test." She gave no factual basis for that conclusion, pointed to no work papers which supported it, and identified no evidence available in 1983 that would have been at variance with the information furnished by Seaward's management, which at all times assured PW that the QEA test was met. Indeed, she testified that the books of Seaward and SISC were in balance, and that they were supported by the underlying journal entries. With regard to PW's alleged shortcomings, she said,

"it's hard to tell from looking at the entries which were reported what actually was on that company's books . . . . [s]o if you'd made an investigation at the time, you might have been able to straighten some of this out. I can't tell from the record exactly what you could have done, but you certainly should have at least tried."

On cross-examination the expert was asked:

Q If you had a list of qualified export receivables, and if the comptroller used that to go through and make a computation of the qualified export assets as you approached the end of the year, and if the accounting firm auditing that particular company reviewed that list, would that be a sufficient evidentiary basis to find that the QEA test had been satisfied?

A Well, when you're doing all these ifs, if they had done this monitoring, if they had done this list, and if they had done

these precalculations, did you come out with 95 percent or not?

Q I came out with 95 percent.

A Then it seems like that should have done it.

The cross-examiner's question was based upon PW's evidence as to the work it had actually done. Seaward made no effort to refute that evidence.

When granting PW's motion to strike, the trial court observed:

> The alleged negligence of [PW] is that the auditors failed to look at the backup material, but merely accepted Mr. Bryan's representation that the DISC met the test . . . . [W]hat would [PW] have discovered if they had looked as Seaward says they should have looked? In an effort to answer that question, . . . Seaward says in its brief that [PW] would have found that the DISC had insufficient qualified export assets to meet the test for its fiscal year ending in 1983 . . . . But [Seaward] failed to prove that.

> I kept waiting for the evidence . . . and it's very, very direct and very simple . . . it would have taken half an hour to prove. Witness one gets on the stand: "I am familiar with the records of Seaward as of . . . whatever day you want to say is the day or dates on which [PW] should have looked and should have found . . . here they are."

> Witness two, an expert, gets on the stand and says "I have reviewed this pile of records . . . and I can say . . . that a competent auditor . . . should have looked at these records and, if they had looked at these records, would have found that the DISC was not going to qualify and should have then told Seaward . . . ." Now that evidence was never produced. It just wasn't there.

■ We think the trial court analyzed the evidence correctly. In an action to recover damages for professional malpractice, as in any other action at law, the plaintiff ordinarily has the burden of producing sufficient evidence of negligence, or breach of the terms

of the defendant's contract,[3] to frame an issue of fact to be submitted to the jury. Unless a malpractice case turns upon matters within the common knowledge of laymen, *see, e.g., Easterling* v. *Walton*, 208 Va. 214, 218, 156 S.E.2d 787, 790-91 (1967) (foreign object left by surgeon in patient's body), or upon rules which have ripened into rules of law, *see, e.g., Spainhour* v. *B. Aubrey Huffman & Assoc.*, 237 Va. 340, 346, 377 S.E.2d 615, 619 (1989) (surveyor's duty to follow rule that monuments prevail over acreage measurements), expert testimony is required to establish the appropriate professional standard, to establish a deviation from that standard, and to establish that such a deviation was the proximate cause of the claimed damages. *Raines* v. *Lutz*, 231 Va. 110, 113, 341 S.E.2d 194, 196 (1986).

The definition of "generally accepted auditing standards," and the application of that definition to the facts of a particular case, are matters beyond the common knowledge of laymen. Accordingly, the plaintiffs in the present case had the burden, common to most malpractice actions, of producing expert testimony which would not only define the applicable standard, but also would adduce facts from which the jury could find that the defendant had deviated from it. Such a finding may not be left to speculation. A jury may draw inferences from facts in evidence, but it may not draw inferences from conjecture. *Southern R. Co.* v. *Hall*, 102 Va. 135, 139, 45 S.E. 867, 868 (1903).

Here, the record is devoid of facts from which the jury could properly infer negligence. The plaintiffs failed to prove what, if any, records were available in 1983 which, if discovered and examined with the greatest professional skill and diligence, would have revealed to the auditors that the information provided by the plaintiffs' employees was incorrect. For all the jury could determine, no such records existed in 1983.[4] The evidence provided no facts from which the jury could infer an answer to that

---

[3] Here, the alleged negligence was the defendant's failure to follow "generally accepted auditing standards." Because those were the precise terms of the contract between the parties, the plaintiffs' burden was the same under both their tort and contract theories.

[4] Agents of the IRS concluded that SISC had failed to meet the QEA test based upon records examined in 1985, not in 1983. Further, no witnesses were called to testify with respect to the IRS investigation. The report of the IRS was not admitted in evidence for the truth of its content, but merely to show the position the IRS had taken. Indeed, PW takes the position here, as it did below, that there is no probative evidence in this case that SISC in fact failed to meet the QEA test in 1983. Because of the view we take of the evidence, we do not reach that question.

crucial question. Because the verdict was necessarily based upon conjecture, the court did not err in setting it aside.

Accordingly, the judgment will be

*Affirmed.*