# CIRCUIT COURT OF LOUDOUN COUNTY

Alfred Webster

    v.

Heckler & Koch, Inc.

Richard C. Riley

    v.

Heckler & Koch, Inc.

June 4, 1999

Case Nos. (Law) 18279, 18280

BY JUDGE JEAN HARRISON CLEMENTS

This case came before the court on March 23, 1999, on Defendant's Motion for Judgment Non Obstante Veredicto and/or Motion to Reconsider Defendant's Motion to Strike, and Defendant's Motion for Remittitur after a jury awarded Plaintiffs Richard Riley and A. J. Webster damages in the amounts of $80,000.00 and $28,500.00 respectively for personal injuries sustained while participating in a weapons training course by Heckler and Koch, Inc. (HAK), the Defendant.

Defendant moves this court to enter a judgment on behalf of the Defendant, *non obstante veredicto*, or in the alternative, to reconsider the Motion to Strike made on the same grounds stated on the trial record, which includes failure to plead a duty and/or establish a standard of care at trial and a bar to damages on the grounds of assumption of risk as a matter of law. The Court will address each issue as presented.

In the case at bar, the evidence presented and the inferences that can be logically drawn from the facts as presented are as follows.

Plaintiffs on September 1, 1994, the date of the incident, were members of the Durham, N.C., Police Department attending a training course in Loudoun County in preparation for forming a SWAT team. The sixteen members of the Durham Police Department were together for the flash bang training exercise on the date of the incident.

The training was conducted by Defendant, whose international training division prepared law enforcement personnel and military groups with realistic tactical and weapons training for a fee. (Plaintiffs' Exhibit 4.) On the date of the incident, the Durham Police Department team was not the only group being trained at the Loudoun County location. Approximately forty-six people were enrolled for the six-day session. Average enrollment is forty to sixty participants per session. There were approximately four groups of ten to twelve people. Training involved using a rotation system for the various training exercises.

All of the witnesses testified to the safety instructions reviewed before the course began. Instructions include: # 5 Anyone who sees a safety problem reports it immediately to an instructor, # 9 Anyone may stop an exercise if they see a safety problem, and # 11 Realistic training is important but safety comes first. (Plaintiffs' Exhibit 1.)

The house used for the HAK training exercises is used by at least one other group for training purposes, namely, the Loudoun County Sheriff's Department. HAK cleans up the house before beginning its six-day training session. Cleaning up has included removing pieces of ceiling and debris left on the floor of rooms. HAK had been using the house for training since around 1990, without injury to any of its students. The window in the dining room did not have glass. Other rooms on the ground floor no longer had a ceiling intact. A training group did not occupy the room located on the other side of the staircase at the time of the incident.

The Plaintiffs and the other officers of their police department were in a room generally described as the dining room that had a ceiling intact as the exercise began. Each member would move from the dining room to the staircase, throw a flash bang up the staircase, wait for it to explode, then go to the second floor to observe the flash bang from a different perspective, and finally move outside and wait for the other members to complete the exercise. A flash bang is a distraction device, which, upon detonation is an extremely loud and bright device. As described by Webster, the pressure from the explosion "takes your breath in just a couple of seconds ... it will blow the windows out ... completely out of the windows ... it's 1,000, 10,000 times

more [loud] than a firecracker ... and if you close your eyes, you can still see the flash. (Tr. P. 413, 414.)

At a point during which the Durham Police Department team was being trained in flash bangs, several members noticed that with each subsequent flash bang explosion, the ceiling in the dining room was cracking. Each subsequent explosion resulted in further cracking and sagging of the ceiling, plus dust and pieces of ceiling debris fell.

Plaintiffs stopped the exercise on three occasions to inform instructors of the safety concern with the ceiling. Two instructors and the director of training were notified of the safety concern. On each occasion, according to Plaintiffs and their witnesses, the instructors offered an assurance that either: the ceiling was okay, an instructor would keep an eye on it, they should move to the wall away from the crack for safe keeping, or in a final gesture, that a sofa propped up on its end would support the sagging section of ceiling while the flash bang exercise continued. After each interruption of training, HAK resumed the exercise of throwing the flash bangs.

Plaintiffs asked the director of training if they could leave the (dining) room and wait outside for their turn. Plaintiffs were told: they needed to stay in that room, remaining in that room was part of the assignment, and there were other exercises outside and they needed to remain inside. The director of training testified that he only recalled moving people over to the wall away from the crack just in case there was a problem. He did not expect there to be a problem.

The exploding of the flash bangs caused the continued deterioration of the ceiling, which ultimately fell as one large piece, hitting the plaintiffs and causing them personal injury.

*Failure to Plead a Duty*
*and/or Establish a Standard of Care at Trial*

Defendant argues that there was no allegation of a duty owed nor was there any evidence presented as to what its duty should have been, and therefore, the Plaintiffs' case should be stricken. Plaintiffs allege in their Motion for Judgment that a business relationship existed between themselves and the Defendant. The Plaintiffs were law enforcement officers enrolled in training in the Tactical Team I School conducted and owned by the Defendant, Heckler & Koch, Inc. Fees for the training were paid to HAK. By virtue of their relationship, the Defendant, by law, had a duty to provide ordinary care to keep the Plaintiffs safe under the circumstances. *Burdette v. Marks*, 244 Va. 309, 312 (1992). "The law determines the duty, and the jury, upon the evidence, determines whether the duty has been performed." *Acme*

*Markets v. Remschel*, 181 Va. 171 (1943).

In the Motion for Judgment, Plaintiffs allege that the Defendant in the course of operating the flash bang training exercise was negligent in its failure to use ordinary care, and its negligence was the proximate cause of the accident and of the injuries sustained by the Plaintiffs. Defendant, however, cites *Spainhour v. B. Aubrey Huffman & Assocs., Ltd.*, 237 Va. 340 (1989), as support for its position that HAK should have been judged by the standard of care in their profession necessitating the testimony of experts familiar with the standard.

There is no allegation of professional malpractice. There is no allegation that the injuries sustained by the Plaintiffs were caused by the use of weapons or by the method of training by the HAK organization. Therefore, expert testimony regarding weapons, weapons training, and a standard of care during such training was not required. Likewise, there was no need for technical or scientific explanation for the ceiling's demise. The injuries sustained by the Plaintiffs were caused by a collapsing ceiling. The inference that each explosion of a flash bang caused the ceiling to further deteriorate and to finally collapse was well within the grasp of a jury's common knowledge, and therefore, expert testimony was unnecessary. *Dickerson v. Fatehi*, 253 Va. 324 (1997).

Repeated testimony was given that with each flash bang thrown, the ceiling deteriorated. Plaintiffs' witnesses testified that the director of training and two other instructors saw the change in the ceiling with each subsequent flash bang thrown. Defendant testified it believed there would be no problem. Whether the Defendant was negligent in its duty to keep the Plaintiffs safe by stopping the exercise or by moving the Plaintiffs to another area, whether the Defendant used the ordinary care a reasonable person would have used, was properly a question for the jury.

### Assumption of Risk

Defendant argues that the Plaintiffs are barred from recovery as a matter of law because they knew the nature and extent of the risk and voluntarily incurred the risk by remaining in the room where the ceiling was cracking and sagging and which by ultimately collapsing caused injury to the Plaintiffs. At trial, jury instructions were given regarding assumption of risk, and the jury found in favor of the Plaintiffs. At issue is whether the instruction was properly given, or whether Plaintiffs should have been barred from recovery as a matter of law.

The Supreme Court of Virginia has held that the defense for when a plaintiff voluntarily has assumed the risk of injury is a jury question unless

reasonable minds cannot disagree on the facts and the inferences to be drawn from the facts. *Waters v. Safeway Stores, Inc.*, 246 Va. 269 (1993); *Holland v. Shively*, 243 Va. 308 (1992); *Van Collom v. Johnson*, 228 Va. 103 (1984). Defendant argues that Plaintiffs, through their own testimony and that of the other Durham police officers, have established that they knew and voluntarily accepted the risk of remaining under the sagging, cracking ceiling. Defendant argues that no reasonable mind could differ on the issue of whether or not the Plaintiffs had voluntarily assumed the risk of the ceiling falling down upon them.

This Court finds otherwise. The defense of assumption of risk involves a venturousness on the part of the Plaintiffs and has two requirements, the nature and extent of the risk must be fully appreciated and the risk must be voluntarily incurred. *Amusement Slides v. Lehman*, 217 Va. 815 (1977). Enrollment in a weapons training course may infer an appreciation for or knowledge of a risk of injury just as a thrill seeker may anticipate the risk of taking an amusement park ride. However, the Plaintiffs believed that the weapons training course would be reasonably conducted to provide safety for the participants, provided instructions were followed. It was for the jury to determine if there was negligence on the part of the Defendant to continue the flash bang exercise which caused the ceiling to collapse while the Plaintiffs remained in the dining room, and/or whether the risk of remaining there was assumed by the Plaintiffs. *Id.*

In this case, there is the possibility for reasonable minds to disagree on the extent of the risk known, understood, and appreciated by the Plaintiffs. Plaintiffs observed the ceiling crack, sag, and the dust and ceiling debris fall after each flash bang explosion. Chunks of ceiling fell, and for safety reasons, Plaintiffs stopped the training exercise on three occasions to point out the ceiling to those in charge.

There was disagreement between the instructors and the trainees as to the severity of the situation. The director of training observed the ceiling in the dining room and testified that ceilings upstairs also had cracks. He further testified that Defendants had routinely swept ceiling debris from floors in the building after training sessions before. No injuries had occurred from the use of the building which began in 1990. The Plaintiffs were moved to a side of the room away from the cracking ceiling. The Defendants resumed the exercise. A flash bang was thrown and the ceiling came down, not in chunks, but in a wave, in one large piece, as though hinged.

The Plaintiffs, following instructions given by the director of training and two other instructors, may have surrendered their better judgment by relying upon the assurance of protection against risk and by remaining in a room with

a cracking ceiling. Unless the Plaintiffs knew or should have known the danger was so extreme that there could have been no reasonable reliance upon such an assurance based on the evidence in this case, Plaintiffs did not assume the risk. *Restatement of Torts* (Second) § 496E, Comment a.

The second element of assumption of risk is that the Plaintiffs must voluntarily accept the known risk. Acceptance of the risk in a known situation is not to be regarded as voluntary where the Defendant's tortious conduct has forced upon the Plaintiffs a choice of courses of conduct, which leaves no reasonable alternative of taking their chances. A Defendant who, by his own wrong, has compelled the Plaintiff to choose between two evils cannot be permitted to say that the Plaintiff is barred from recovery because he has made the choice. (*Restatement*, Comment c.)

Defendant argues the choice between alternatives must be made during an exigent circumstance and argues that by stopping the exercise on three occasions, the Plaintiffs themselves have proven there was no immediate danger forcing their decision to remain in the room. *Van Collum v. Johnson*, 228 Va. 103 (1984), and *Greater Richmond Transit Company v. Wilkerson*, 242 Va. 65 (1991). However, the Restatement does not eliminate all circumstances except exigent ones when choosing between evils.

The director of training and the other instructors do not recall being asked by the Plaintiffs if they could wait outside because of the ceiling condition. There was repeated testimony that the Defendants told the Plaintiffs they could not leave the dining room while they waited for their turn at the flash bang exercise. Officer Padgett recalls the reason the Plaintiffs were to remain inside was because of other exercises being conducted "out there." Plaintiffs recall being told to remain inside because it was part of the assignment. Furthermore, those who had finished their turn at the exercise were to wait outside and were not to leave that area because of accountability for the students.

Plaintiffs also testified they were concerned, based on the demeanor of the director of training after they had stopped the exercise on three occasions, that they would not receive a certificate of completion for the exercise if they did not follow instructions. They were concerned for their careers as police officers and as SWAT team instructors. This was a police training course run in a quasi-military fashion. Respect for authority and obeying instructions was expected, plaintiffs were forced to choose between accepting the risk of remaining in a room with a cracking ceiling with the assurance that the risk was monitored by the instructors, protecting their professional interests by completing the course, or disobeying the instructors and going to an unauthorized location. The Defendants did not terminate the exercise until a

safe place was found for the two remaining Plaintiffs to wait their turns. "[A]ssumed risk implies intentional exposure to a known danger ... and ... embraces a mental state of willingness ... ." 65 C.J.S., *Negligence*, § 117, page 711; 38 Am. Jur., *Negligence*, § 172, page 847. The exposure to risk, whether it was the willing acceptance of the Plaintiffs or the liability of the Defendants was properly an issue for the jury.

For all of the aforesaid reasons, the Motion of the Defendant is denied.

The Defendant also filed a Motion for Remittitur and/or New Trial which was argued by counsel and taken under advisement by the Court.

Each Plaintiff in his Motion for Judgment prayed for judgment in the amount of $500,000.00. In closing argument, Plaintiffs' attorney advised the jury of the amount prayed for. The court gave Instruction 12, "The amount sued for is not evidence in this case; you should not consider it as evidence in arriving at your verdict."

The jury was further instructed against a verdict based upon sympathy, bias, guesswork, or speculation, Instruction 2; that the Plaintiffs had the burden to establish damages, Instruction 14, and injuries, Instruction 4; that Plaintiffs had the burden on each item of damages, not as to exact amounts but sufficient for the jury to make a reasonable estimate of each item or he could not recover for that item, Instruction 11. Finally the Court gave a separate instruction for each Plaintiff, and they differed because of the Court's view that Mr. Riley presented no evidence for consideration by the jury of disfigurement or deformity with humiliation or embarrassment, Instruction 15 (Webster) and Instruction 16 (Riley).

The Virginia Model Jury Instructions, Civil, Instruction No. 9.000 is a general personal injury and property damage instruction, and it contains eight elements of damages for consideration. Four of those were not offered in this case: any medical expenses incurred in the past (future); any earnings lost; lessening of earning capacity (past/future); property damage.

In each case, there was minimal evidence about medical expenses being incurred but no evidence of any amounts incurred, paid, or owed. There was no evidence of any property damage. While each Plaintiff testified to physical and mental effects upon his employment, there was no evidence of lost time from work and no monetary evidence of lessening of earning capacity. Plaintiffs did not proffer instructions with any of these elements.

In tort law, damages are "a sum of money awarded to a person injured by the tort of another." Charles E. Friend, *Personal Injury Law in Virginia* (1990). Plaintiff must therefore establish that some injury has been suffered before damages can be awarded. Plaintiff is not required to prove the "amount of his damages with certainty." Rather the evidence must be sufficient for the

trier of fact to make "an intelligent and probable estimate of the amount of damage." The tendency is to determine whether damages are reasonably certain or speculative by comparing the award to the evidence of determinable pecuniary monetary loss. However, the Supreme Court has recognized that except for the actual expenses incurred "there is no fixed or mathematical rule by which compensatory damages are measured." Therefore, within reason, considering the elements of injury, loss, and damage which are properly before the jury, it is within their judgment and discretion unless the conscience of the Court is so shocked to justify the belief that the jury was influenced by partiality, prejudice, or mistake.

Counsel for Defendant argues that Plaintiff's counsel made certain statements in his opening argument and in several questions put to Mr. Myer about the nature and size of the Defendant as a large, international gun manufacturer and dealer which did or must have prejudiced the Defendant in the minds of the jury. Defendant made no objection to Plaintiff's opening argument, and the Court gave the jury oral instruction that such was not evidence. The Court sustained Defendant's objections to the questions to Mr. Myer, struck them, and had given oral instruction that such was not to be considered as evidence. Additionally, the Court notes that the verdicts were very dissimilar and disparate — $80,000.00 for Plaintiff, Mr. Riley, and $28,500.00 for Plaintiff, Mr. Webster.

The Court turns next to the instruction it gave as to each Plaintiff and the evidence, in the light most favorable to Plaintiff, that the jury had to consider.

### Mr. Webster — Instruction 15

Mr. Webster's injuries past and future are best categorized in terms of objective and subjective injuries. The objective injuries were wounds to the forehead and forearm, a knot on the right elbow and forearm, a scar on his left arm, numerous bruises at the time of the accident, and the fact that Mr. Webster was briefly rendered unconscious when the ceiling collapsed. His subjective injuries included tenderness over his right elbow, tingling in his right arm, "noise" and shoulder pain caused by raising his right arm, pain over inner side of his right knee after extended periods of standing, squatting, or running, and headaches, which were constant both day and night and lasted for approximately three to four months after the accident.

Mr. Webster is still taking pain medication and suffers from a shoulder impingement, knee pain after extended standing, running, or squatting, occasional tingling of his right arm to his fingertips. The jury could conclude that at least the shoulder injury could be permanent based on the doctor's testimony that if the shoulder/rotator cuff pain persisted after 6 to 12 weeks

after the accident, then there could be a tear or permanent injury.

Mr. Webster testified as to the mental anguish associated with the constant headaches and the difficulty he had concentrating, in general. He has abandoned his role as a marksmanship instructor due to pain in his knee and his shoulder. He can no longer qualify for the U.S. Team participating in the PALMA event.

The disfigurement to Mr. Webster is a scar on his left arm which he put up to protect himself against the falling ceiling.

The inconvenience caused to Mr. Webster includes visits and consultations with at least three different doctors. There may not be a cure for his shoulder pain, but he does get relief from medication. There is no indication of how long he will need to take anti-inflammatory medications. There may be the possibility of future knee surgery for Mr. Webster, but practically speaking, no time lost until and only if he accrues and then uses those sick days from work.

As Mr. Webster testified, the inconvenience, both past and future, caused by the injuries he sustained from the accident is not from the activities he is prevented from doing, but rather from the impediment of those activities.

### Mr. Riley — Instruction 16

Mr. Riley's injuries as reviewed from a medical history include minor lacerations to head and scalp, headaches which were occipital, front neck discomfort, and upper back neurocirculatory symptoms. Several weeks after the accident, Mr. Riley was experiencing more generalized neck, thoracic, and lower lumbar pain, with occasional pain in the C-5 to C-7 distribution, and some numbness in his right arm. Mr. Riley had trouble sleeping and difficulty with the various medications prescribed, including difficulty with his GI tract, namely, bleeding ulcers and allergic reactions. Medications, physical therapists, and the level of therapy changed over the course of the past two and a half years. Mr. Riley has experienced continuing neck and upper back pain, pain on a daily basis, a grinding sensation in his neck and right shoulder, and lumbar spasms.

The inconvenience to Mr. Riley has been that he has been seen by at least four doctors and specialists, three physical therapists, has had x-rays, and a thoracic MR Scan. The final solution after exams, meds, tests, and therapists is that he has to deal with the residual pain. He is no longer on the SWAT team that he had been instrumental in forming.

Upon all of the evidence in each case, the Court cannot conclude that the verdicts were without sufficient evidence to support them, and therefore, the Motion for Remittitur and/or New Trial is denied.