**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1314**

STAR BROADCASTING, INCORPORATED,

Plaintiff – Appellant,

v.

REED SMITH, LLP,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:08-cv-00616-CMH-JFA)

Argued: March 25, 2010            Decided: April 14, 2010

Before NIEMEYER and KING, Circuit Judges, and Eugene E. SILER, Jr., Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Arthur Mark Schwartzstein, McLean, Virginia, for Appellant. William B. Cummings, WILLIAM B. CUMMINGS, PC, Alexandria, Virginia, for Appellee. **ON BRIEF**: Jack D. Lapidus, MACLEAY, LYNCH, GREGG & LYNCH, Washington, D.C., for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In June 2008, Star Broadcasting, Incorporated ("Star"), instituted this legal malpractice suit in the Eastern District of Virginia, alleging that the law firm Reed Smith, LLP ("Reed Smith"), committed malpractice by rendering negligent advice in its representation of Star. In February 2009, after assessing the relevant summary judgment record and applicable state law legal principles — particularly with respect to expert-witness issues — the district court awarded summary judgment to Reed Smith. See Star Broad., Inc. v. Reed Smith, LLP, No. 1:08-cv-00616 (E.D. Va. Feb. 24, 2009) (the "Opinion"). This appeal followed and, as explained below, we affirm.

I.

A.

In early 1998, the Defense Commissary Agency (the "DeCA") — a Department of Defense agency that operates a worldwide chain of approximately three hundred commissaries providing grocery items to military personnel, retirees, and their families — issued a Request for Proposal, seeking a contractor to install, maintain, and operate a satellite-based radio network in its

2

commissaries (the "RFP").[1]  The RFP explained that the contractor would be responsible, at no cost to the DeCA, for broadcasting music and announcements over the radio network.  Importantly, the RFP further specified that the contractor "will be expected to sell air time to potential advertisers to cover all cost[s] associated with operation of the network and provide [the] DeCA with a percentage of revenue generated by its sales."  J.A. 59.[2] In other words, the DeCA expected the contractor to finance the radio network by selling advertising opportunities to the DeCA's vendors — who supplied the commissaries with food and other items — and to pay a percentage of the resulting advertising revenue to the DeCA as a commission.

In the spring of 1998, Star — a Minnesota corporation in the business of installing and operating on-site radio networks — submitted a contract proposal in response to the RFP.  In November 1998, the DeCA invited Pasquale ("Pat") DiPlacido — Star's sole shareholder, president, and CEO — to present Star's proposal at the DeCA's headquarters in Fort Lee, Virginia.

---

[1] The facts spelled out herein are drawn from the summary judgment record and are presented in the light most favorable to Star, as the nonmoving party in the summary judgment proceedings.  See Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004).

[2] Citations herein to "J.A. ___" refer to the Joint Appendix filed by the parties in this appeal.

Written materials that DiPlacido provided to the DeCA during the presentation confirmed that Star expected to generate sufficient advertising revenue from the DeCA's vendors to cover its costs of operating the radio network in the commissaries. DiPlacido emphasized, however, that the DeCA would need to promote the network and encourage vendors to advertise in order for the project to be financially viable. Indeed, Star's written materials reflected that, pursuant to its proposal, the DeCA would be obligated to encourage vendors to purchase advertising from Star at a minimum rate of one quarter of one percent of the DeCA's purchases from each vendor.[3] Star referred to this mechanism — that is, the DeCA's obligation to promote the radio network and encourage its vendors to purchase a minimum percentage of advertising — as "cooperative advertising."

On February 8, 1999, the DeCA decided to accept Star's radio-network proposal for its commissaries. To initiate the contract-drafting process, a contracting officer at the DeCA sent Pat DiPlacido of Star a draft contract, which the parties referred to as the "strawman" agreement (the "strawman"). The strawman provided that Star, in return for an exclusive license to operate a radio network in the DeCA's commissaries, was

---

[3] For example, if the DeCA purchased $1 million in goods from a particular vendor, the DeCA would encourage that vendor to purchase at least $2500 in advertising from Star.

obliged to install, maintain, and operate the network at no cost to the DeCA. Other than granting Star an exclusive license, the strawman imposed no obligations on the DeCA. Notably, the strawman did not reference Star's proposed cooperative advertising program. After forwarding the strawman to Star, the DeCA also scheduled a meeting with Star officials, to be held on February 18, 1999, in order to finalize the license agreement.

Prior to the February 18 meeting of Star and the DeCA, Pat DiPlacido contacted Glenn Mahone, primarily a commercial transactions partner in Reed Smith's Pittsburgh office, and requested that Mahone and Reed Smith represent Star in negotiating the final terms of the license agreement with the DeCA. Between February 9 and February 16, 1999, Pat and Frank DiPlacido (Pat's brother and Star's vice-president) discussed the strawman with Mahone on multiple occasions. The DiPlacidos advised Mahone that the radio network could not be successful without a cooperative advertising program. Attorney Mahone thus knew that Star would not enter into a license agreement unless the DeCA agreed to promote the radio network and encourage its vendors to purchase advertising. Accordingly, Mahone prepared, on behalf of Star, a revised strawman agreement (the "revised strawman") that included a "best efforts" provision, obligating the DeCA to "use its best efforts to assist Star in the development and implementation of an effective advertising

5

inventory sales program." J.A. 135. The revised strawman further obligated the DeCA to develop and implement "a vendor cooperative advertising program . . . with a minimum of one-quarter (1/4) of (1) one percent participation rate designated for In-Store Radio" and "programs designed to promote the In-Store Radio Network to commissary vendors." Id. at 136. Mahone advised Star that the best efforts clause included in the revised strawman "met Star's needs" and obligated the DeCA to promote the radio network and implement a cooperative advertising program. Id. at 224. Mahone did not, in his work for Star, consult with a government contracts specialist, nor did he research any legal principles that could possibly limit the DeCA's ability to promote Star's radio network.

On March 12, 1999, after the DiPlacidos and Mahone met with DeCA officials at Fort Lee to discuss the revised strawman, the parties executed their agreement (the "License Agreement" or "Agreement"). The License Agreement called for Star to sell advertising directly to the DeCA's vendors, but required the DeCA to exercise its best efforts to assist Star in implementing an advertising sales program to attract vendors to advertise on the radio network. In particular, the DeCA agreed to assist Star in developing and implementing a cooperative advertising program, with a targeted minimum participation rate of one quarter of one percent. The Agreement further obligated the

6

DeCA to inform vendors of Star's radio network in the commissaries and encourage their full participation in advertising opportunities available through Star.

Shortly thereafter, Star began performing under the License Agreement by installing its in-store radio network in the DeCA's commissaries and selling advertising opportunities to the DeCA's vendors. Mahone and Reed Smith had no further professional contact with Star concerning the Agreement until September 2002.

B.

In approximately June of 2002, more than three years after the License Agreement had been executed, the DeCA requested a meeting with the DiPlacidos concerning Star's failure to abide by the Agreement's installation timeline, which specified that Star was to complete installation of the radio network in the commissaries by November of 2000.[4] The DeCA was also concerned about maintenance problems experienced at those commissaries where Star had installed the radio network. Star thus agreed to meet with the DeCA and included as a meeting agenda item its concern that the DeCA had not implemented the Agreement's cooperative advertising program with its vendors. On September 25, 2002, the DiPlacidos (without Mahone) met with the DeCA

---

[4] By June 2002, Star had completed installation in about 90 of the DeCA's commissaries.

officials at Fort Lee. With respect to the cooperative advertising program, the DeCA asserted that it was willing to do all that it could to promote the radio network but that it could not legally require its vendors to participate therein. When Star explained that the cooperative advertising program did not require the DeCA's vendors to purchase advertising, the DeCA asked Star for drafts of documents it might use to facilitate the cooperative advertising program.

In late September 2002, Pat DiPlacido contacted Mahone and engaged him and Reed Smith to assist Star in drafting documents that the DeCA might use to implement cooperative advertising agreements with the commissaries' vendors. As a result, Mahone prepared a series of documents that set forth the "details" and "requirements" of the proposed cooperative advertising program. These documents specified that the program "would consist of participation by the Vendor in the DeCA In-Store Radio Network . . . based on a [rate of one quarter of one percent] of [the] DeCA purchases from the Vendor as a participation rate," and that each vendor would pay Star for the advertising it purchased. J.A. 151. The proposed cooperative advertising program would thus be implemented by agreements between the DeCA and its vendors, with Star as the third-party beneficiary.

In addition to drafting the cooperative advertising documents, Mahone also prepared a proposed amendment to the

8

License Agreement (the "proposed amendment" or "amendment"). The proposed amendment included a provision mandating that the DeCA implement a cooperative advertising program, specifying that

> [the] DeCA shall develop and implement procedures, with the buyers and merchandise managers, to inform vendors of the [radio network] . . . and encourage their full participation in the In-Store Radio advertising and promotion opportunities available through Star and the Network. A cooperative participation rate for all vendors and service contractors would be a targeted minimum of one-quarter (1/4) of one percent (1%) of all [the] DeCA purchases . . . .

J.A. 161. On December 19, 2002, Frank DiPlacido sent the various cooperative advertising documents and the proposed amendment to the DeCA.

Six months later, on June 18, 2003, a DeCA contracting officer wrote to Star and rejected the proposed cooperative advertising program and the proposed amendment. The DeCA official explained that the cooperative advertising program would illegally obligate the DeCA to enter into advertising agreements with its vendors, requiring that such vendors purchase advertising from Star. The DeCA's letter emphasized that the "Standards of Conduct for government personnel do not permit us to require that our suppliers use specific merchandising or advertising sources." J.A. 168. The DeCA insisted, however, that it would continue to promote Star's

9

radio network within its regulatory limitations (e.g., by announcing the network's availability, displaying Star's informational brochures and posters, and advising vendors of advertising opportunities).

Shortly after receiving the DeCA's June 18, 2003 letter, Pat DiPlacido again consulted with Mahone, seeking to identify Star's options. Mahone advised Star that the portion of the License Agreement calling for a cooperative advertising program was enforceable and that the DeCA, by failing and refusing to implement the program, had breached the Agreement. Nevertheless, he advised DiPlacido that Star should continue to operate its radio network and complete the installation thereof in the commissaries, emphasizing that Star had already failed to adhere to the installation timeline and thus might be unable to enforce the Agreement against the DeCA. Mahone advised that Star could seek to recoup its losses in a breach of contract lawsuit to be pursued after the Agreement's expiration. Once again, Mahone did not consult any of his colleagues at Reed Smith, including those in the firm's government contracts group. Consistent with Mahone's advice, Star continued to perform under the Agreement. In August 2004, however, the DeCA exercised its right not to extend the Agreement beyond its termination date of December 31, 2005.

On June 13, 2008, approximately two-and-a-half years after the License Agreement had expired, Star initiated this malpractice suit against Reed Smith in the Eastern District of Virginia, invoking diversity jurisdiction under 28 U.S.C. § 1332.[5]  The complaint alleged that Mahone and Reed Smith had failed to "competently represent Star in its relationship with [the] DeCA" by neglecting to "appropriately involve Reed Smith's government contracts attorneys . . . to determine whether the contract he negotiated for Star was enforceable."  J.A. 18. Star alleged that a reasonable lawyer negotiating a complex transaction with a governmental agency would have first consulted with a lawyer experienced in government contracts. The complaint also alleged that, had Mahone done so, he would have learned that federal regulations barred the DeCA from endorsing the radio network and would have advised Star accordingly.  Star thus alleged that Mahone's and Reed Smith's negligence was the proximate cause of all losses incurred by Star as a result of the License Agreement.

Reed Smith moved for summary judgment on November 17, 2008, contending, inter alia, that Star had failed to produce

---

[5] Star is a Minnesota corporation with its principal place of business in Minneapolis.  Reed Smith is a limited liability partnership, and none of its partners are citizens of Minnesota.

sufficient expert testimony to establish the elements of its malpractice claim. In response, Star asserted that expert testimony was not required to survive a summary judgment motion, as its malpractice claim turned upon matters within the common knowledge of laypersons. In the alternative, Star maintained that summary judgment was precluded because its expert witnesses had forecast sufficient proof of its malpractice claim, including the applicable standard of care, Reed Smith's breach thereof, and proximate causation.

In its Opinion of February 24, 2009, the district court carefully assessed the parties' contentions and determined to grant Reed Smith's summary judgment request. The Opinion recognized that to establish a professional malpractice claim under Virginia law, the plaintiff must present expert testimony on the applicable standard of care, any breach thereof, and proximate causation, unless the claim turns upon matters within the common knowledge of a layperson. See Opinion 16–17 (citing Gregory v. Hawkins, 468 S.E.2d 891, 893 (Va. 1996); Heyward & Lee Constr. Co. v. Sands, Anderson, Marks & Miller, 453 S.E.2d 270, 272 (Va. 1995); Seaward Int'l v. Price Waterhouse, 391 S.E.2d 283, 287 (Va. 1990)).[6] Because Star's claim involved a

---

[6] Virginia law governs Star's malpractice claim against Reed Smith because the License Agreement was executed and the alleged (Continued)

12

complicated contractual agreement and the possible applicability of government regulations outside the common knowledge of a layperson, the court determined that Star was obligated to present expert testimony. See id. at 17 (citing Gregory, 468 S.E.2d at 893).

The district court then assessed the reports and depositions of Star's proposed expert witnesses, concluding that they had not forecast sufficient evidence to withstand the summary judgment request of Reed Smith. Importantly, the Opinion observed that none of Star's experts had rendered an expert opinion on whether Reed Smith's alleged negligence was the proximate cause of Star's claimed damages. See Opinion 17–19. For example, the court acknowledged that Michael Rigsby, whose opinions Star presented to establish the appropriate standard of care and causation, asserted that Mahone should have consulted a government contracts lawyer before advising Star as to the enforceability of the "best efforts" clause in the License Agreement. The court emphasized, however, that Rigsby offered "no opinion whatsoever as to what would or should have happened if Mr. Mahone had done so." Id. at 18. Similarly, the court assessed the testimony of L. James D'Agostino, Star's

negligent advice was at least partially rendered in the Commonwealth of Virginia.

13

proposed expert witness on government contracts, and ascertained that he too had expressed no opinion with respect to causation. Id. at 17. Although D'Agostino asserted that applicable federal regulations barred the DeCA from obligating its vendors to purchase advertising from Star, he relied exclusively on a Court of Federal Claims decision — PinPoint Consumer Targeting Servs., Inc. v. United States, 59 Fed. Cl. 74 (2003) — rendered well after Mahone had advised Star that the cooperative advertising provision was enforceable. D'Agostino failed to present an expert opinion on whether a government contracts lawyer would have advised Mahone, prior to the PinPoint decision, that the DeCA was legally barred from participating in the cooperative advertising program. Accordingly, the court found that Star had failed to produce sufficient expert testimony and awarded summary judgment to Reed Smith. See Opinion 22.

Star timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.


II.

On appeal, Star maintains that the district court erred in awarding summary judgment to Reed Smith.[7] We review de novo such

--------

[7] More specifically, Star makes two appellate contentions: (1) that the district court erred in concluding that expert testimony was required to establish the elements of its
(Continued)

14

an award, viewing the facts in the light most favorable to the nonmoving party.  See Lee v. York County Sch. Div., 484 F.3d 687, 693 (4th Cir. 2007).  Summary judgment may be awarded only if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Having had the benefit of oral argument and having carefully considered the briefs, the joint appendix, and the applicable authorities, we are satisfied that summary judgment was properly awarded in this case.  Accordingly, we affirm the judgment entered in favor of Reed Smith, substantially for the reasons spelled out by the district court.  See Opinion 16–23.

AFFIRMED

malpractice claim; and (2) that even if expert testimony was required, the depositions and reports of its three expert witnesses were sufficient to withstand the summary judgment request of Reed Smith.

15