**Johnnie GODDARD, and Sarah Goddard, Plaintiffs,**

v.

**PROTECTIVE LIFE CORPORATION, Dr. William Feist, Medical Director, and LabOne, Inc., Defendants.**

**No. Civ.A. 2:99CV735.**

United States District Court, E.D. Virginia, Norfolk Division.

Feb. 10, 2000.

Lanis L. Karnes, Karnes Legal Services, P.C., Virginia Beach, VA, for plaintiffs.

John Y. Pearson, Jr., Daniel T. Campbell, Willcox & Savage, P.C., Norfolk, VA, for defendants Protective Life Corp. & Dr. William F. Feist.

Albert H. Poole, Huff, Poole & Mahoney, P.C., Virginia Beach, VA, Joseph C. Benage, Morrison & Hecker, L.L.P., Kansas City, MO, for defendant LabOne, Inc.

## OPINION AND FINAL ORDER

REBECCA BEACH SMITH, District Judge.

The present matter is before the court on motion for summary judgment by defendants LabOne, Protective Life Corporation, and Dr. William Feist. For the reasons set forth below, the court **GRANTS** summary judgment as to all defendants.

### I. Factual and Procedural History

Plaintiffs, Johnnie and Sarah Goddard, filed a suit in state court, which was removed to this court, pursuant to 28 U.S.C. § 1441, on the basis of diversity jurisdiction. The suit claims damages stemming from an indeterminate Human Immunodeficiency Virus ("HIV") test performed by LabOne on a sample of Mr. Goddard's blood in December, 1997, on behalf of Protective Life Corporation ("Protective"). LabOne, an independent laboratory, performed the HIV test pursuant to a contract with Protective to analyze the medical status of insurance applicants for purposes of determining insurability as part of the underwriting process.

In December, 1997, Mr. Goddard consulted his insurance agent, seeking to increase an existing life insurance policy with Protective. The agent wrote the policy, but ordered that blood and urine samples be taken and analyzed, in accordance with standard procedure, prior to issuing coverage. In connection with, and prior to, this testing, the Goddards signed several forms, including a "Notice and Consent Form for AIDS Virus (HIV) Testing," which authorized the release of test results to, among others, the proposed insured, a licensed physician designated by the proposed insured, and an insurance medical information exchange using nonspecific codes designed to ensure confidentiality. The plaintiffs also signed an "Authorization to Obtain and Disclose Information," which authorized Protective to draw and test the blood and urine samples, to obtain and use any medical information relating to insurability, and to release this information to the Medical Information Bureau ("MIB") using non-specific codes.[1]

On December 8, 1997, paramedics from American Para Professional Systems Para Medical Services ("APPS"), an independent contractor,[2] arrived at the Goddard home and withdrew the samples for testing. These samples were then delivered to, and tested by, LabOne. LabOne performed three dried blood Ezyme–Linked Immunosorbent Assay ("ELISA") tests and one Western Blot Banding Pattern test ("Western Blot test") on the samples. The Western Blot test indicated reactivity in the P24 band and no others. In accordance with Center for Disease Control ("CDC") interpretation criteria, the results were interpreted as indeterminate for HIV.

LabOne reported the indeterminate result to William Feist, M.D., Medical Director of Protective Life Corporation. Dr. Feist notified the Goddards, by certified letter, that the tests had shown some abnormal findings, which might require further clinical evaluation through their personal physician, and that Protective would be unable to insure Mr. Goddard at that time. Protective then reported to the MIB a non-specific code to alert other insurance companies that Mr. Goddard may have a blood disorder of some type.

Concerned by the reference to abnormal findings in the certified letter, Mrs. Goddard contacted Dr. Feist on January 12, 1998, to inquire as to the specific results referred to in the letter. Dr. Feist explained that he could not discuss any results over the telephone; however, at his suggestion, Mr. and Mrs. Goddard scheduled an appointment with their personal physician, Kenneth W. Putland, M.D., that same day. Dr. Putland spoke with Dr. Feist via telephone and had the indeterminate results faxed from Protective to his office.

Dr. Putland stated during his deposition that he did not recall the specifics of the conversation with Dr. Feist. (Putland Dep. at 9, 25). Dr. Putland did state, however, that he knew how to interpret the results, that he was fully aware that the results were indeterminate rather than positive, and that he told the Goddards there was no particular cause for alarm. (Putland Dep. at 9–10; 25–26). The Goddards dispute this testimony and contend that Dr. Putland, in fact, told them that Dr. Feist had indicated during this telephone conversation that the tests performed on behalf of Protective showed that

1. The MIB is a voluntary membership association of life insurance companies, which operates a confidential interchange of information significant to health or longevity as an alert to deter and detect insurance fraud. The information is reported and posted using non-specific codes, which alert other insurers to potential medical problems without disclosing any specific medical conditions. The code reported to the MIB subsequent to Mr.

Goddard's indeterminate result alerted other insurers of a potential blood abnormality, but it did not identify the condition as HIV related.

2. Whether APPS was contracted by Protective or LabOne is a matter in dispute. Plaintiffs have asserted negligence against both defendants as principals for APPS.

Mr. Goddard was HIV positive. (Sara Goddard Dep. at 18–20; Johnnie Goddard Dep. at 27–30).

A repeat test was performed by Dr. Putland during the office visit on January 12, 1998, and a negative result was returned just two days later. Two subsequent tests were also performed. One test was performed by Osborne Laboratories on March 25, 1998, at the direction of a second personal physician consulted by Mr. Goddard. The final test was performed by Sentara Laboratory Services on behalf of Interstate Insurance Company on May 4, 1990, as part of an insurance underwriting decision.[3] Both of these subsequent tests were also negative.

After receiving these negative results, the Goddards contacted their insurance agent seeking to have Protective reconsider coverage. Protective was unwilling to reconsider until Mr. Goddard was retested six months from the initial indeterminate result.[4]

The Goddards also contacted the MIB by letter dated May 27, 1998, seeking to have the non-specific code removed from Mr. Goddard's file. Upon receiving a written request from the Goddards, the MIB notified Protective on July 9, 1998, that the Goddards were disputing the accuracy of the non-specific code that Dr. Feist had reported in January, 1998. Protective then contacted the Goddards for written verification of the subsequent negative results. Immediately after receiving these results, on July 23, 1998, Dr. Feist wrote the MIB confirming that Mr. Goddard's indeterminate status had been subsequently determined to be negative. The MIB, consequently, removed the non-specific code from Mr. Goddard's file.

Mr. and Mrs. Goddard then filed the current action. Plaintiffs seek recovery from LabOne, Protective, and Dr. Feist for negligence,[5] breach of an implied warranty to use reasonable skill and care in the performance of a service contract, and intentional infliction of emotional distress. Plaintiffs also seek recovery from Protective and Dr. Feist for defamation arising from the publication of the non-specific code with the MIB.

Alleging that the defendants' actions caused plaintiffs to endure the mistaken belief that Mr. Goddard was HIV positive, plaintiffs seek compensatory damages from each defendant, jointly and severally, for emotional damages, the added expense of living separate and apart consequent to marital strife caused by this mistaken belief, and medical expenses incurred to alleviate the stress-induced symptoms suffered by plaintiffs as a result of this mistaken belief. Plaintiffs also seek punitive damages in the amount of $500,000. All three defendants have moved for summary judgment on all counts of the complaint.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is improper unless, viewing the record as a whole and in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus.*, 763 F.2d 604, 610 (4th Cir.1985). A party resisting summary

**3.** Plaintiffs did receive life insurance from Interstate Insurance Company, based upon the negative HIV result procured on its behalf by Sentara on May 4, 1998.

**4.** *See supra* note 3.

**5.** Plaintiffs have also asserted "breach of agency" as an independent cause of action

against Protective. However, in substance, this claim is nothing more than a negligence claim against Protective for the actions of APPS under an agency theory of liability. Accordingly, the court considers its negligence analysis dispositive of plaintiffs' "breach of agency" claim. *See supra* note 2.

judgment may not rest on the mere pleadings alone, but instead must show that specific material facts exist that give rise to a genuine triable issue. *See* Fed. R.Civ.P. 56(e); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548; *In re McNallen*, 62 F.3d 619, 623 (4th Cir.1995). A mere "scintilla of evidence" is not sufficient to withstand a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rather, the evidence must be such that a jury could reasonably find for the nonmoving party. *See id.*

## III. Analysis

### A. Negligence

Count I of plaintiffs' complaint asserts four separate theories of negligence against the defendants in the present action: (1) Dr. Feist and Protective were negligent in refusing to retest and reconsider Mr. Goddard upon learning of the subsequent negative results and receiving the plaintiffs' request for retesting; (2) Dr. Feist and Protective negligently stated in the certified letter denying coverage that Mr. Goddard's tests showed some "abnormal" findings; (3) Dr. Feist and Protective negligently communicated to plaintiffs' personal physician, Dr. Putland, that Mr. Goddard was HIV positive; and (4) APPS and LabOne negligently collected and tested the samples, and all defendants are liable for this negligence, either directly or as agents for the negligent parties.

In order to establish a cause of action for negligence, plaintiffs must establish (1) the existence of a legal duty; (2) breach of that duty; (3) proximate causation; and (4) compensable damages. *See Fox v. Custis*, 236 Va. 69, 73, 372 S.E.2d 373 (1988). Upon consideration of the record, the court finds that plaintiffs have failed to come forward with the facts legally necessary to satisfy these elements on any of the theories of negligence set forth in the complaint. For the reasons set forth below, plaintiffs' negligence claims cannot withstand summary judgment.

1. *Defendants Were Under No Duty to Retest and Reconsider Coverage Based Upon the Subsequent Negative Results.*

Whether a duty exists is a pure question of law to be decided by the court based upon the circumstances of each case. *See Burns v. Johnson*, 250 Va. 41, 45, 458 S.E.2d 448 (1995). Generally, the duty to provide insurance or insurance coverage is strictly a matter of contract law. *See generally, State Farm Fire & Cas. Co. v. Walton*, 244 Va. 498, 423 S.E.2d 188 (1992). Absent an express or implied contractual provision, there can be no duty to insure. *See generally, id.* Moreover, common sense dictates that no insurance company can be burdened with a legal duty to provide insurance coverage to every applicant who seeks coverage. The freedom to contract or not to contract, while not absolute, is indeed a time-honored liberty. *See, e.g., Smithy Braedon Co. v. Hadid*, 825 F.2d 787, 791 (4th Cir.1987) (citing *Baltimore & Ohio S.W. Ry. Co. v. Voight*, 176 U.S. 498, 20 S.Ct. 385, 44 L.Ed. 560 (1900) ("The right of private contract is no small part of the liberty of the citizen.")).

Just as this court has no basis for imposing a duty upon insurers to provide insurance to all eligible applicants, this court, likewise, has no basis for imposing upon an insurance company an obligation to exercise all due care to ensure that an applicant who may be insurable under the company's policies does, in fact, receive that insurance coverage. Accordingly, the mere fact that Protective and Dr. Feist may have received notification of Mr. Goddard's subsequent negative test results, making him potentially insurable under Protective's policies, is insufficient, as a matter of law, to create a duty in either Protective or Dr. Feist to retest and reconsider the decision to deny coverage.[6]

---

6. Moreover, the court notes that Mr. Goddard was informed that Protective would retest and reconsider the coverage decision in six months from the indeterminate result, if the Goddards were still interested in Protective insurance at that time. (Compl.¶ 42).

2. *There is No Evidence that Communicating an Indeterminate Result as an Abnormal Finding Was a Negligent Act.*

■ Plaintiffs also seek recovery based upon their allegation that Dr. Feist and Protective were negligent in stating in the certified letter mailed to the Goddards to deny coverage that the tests showed some abnormal findings. In support of this argument, plaintiffs, citing to the *New Webster's Dictionary* (1993), contend that neither "indeterminate" nor "inconclusive" equate with "abnormal," but rather the terms are defined as "failing to lead to or result in a conclusion." Plaintiffs contend that indeterminate results are not, by definition, abnormal and are, if not commonplace, certainly not so rare as to be deemed anomalous. Plaintiffs further argue that "abnormal," unlike "indeterminate," typically carries a negative connotation such that a reasonable layperson would suffer extreme concern upon receiving such a result.

In making this argument, however, plaintiffs have failed to put forth even a scintilla of admissible expert evidence that referring to the findings as "abnormal" in this circumstance was negligent.[7] "Professionals charged with negligence are ordinarily ... to be judged by the standard of care prevailing in their profession at the appropriate time and place. This necessitates the expert testimony of fellow professionals, familiar with the standard, to explain it to the fact-finder." *See Spainhour v. B. Aubrey Huffman & Assocs., Ltd.*, 237 Va. 340, 345, 377 S.E.2d 615 (1989). Unless the case turns upon matters within the common knowledge of laymen, plaintiffs must come forward with expert testimony to establish the appropriate professional standard of care, and to establish a deviation from that standard, in order to create an issue of fact to be submitted to the jury. *See Seaward Int'l, Inc. v. Price Waterhouse*, 239 Va. 585, 591, 391 S.E.2d 283 (1990).

Moreover, pursuant to the evidence before the court, there appears to be nothing inaccurate in the defendants' characterization of the results. The letter sent by Dr. Feist stated, in relevant part, "Some of the findings are abnormal and may require further clinical evaluation." (Letter from Feist to Johnnie Goddard of 12/31/97). Nothing in this statement was inaccurate, as an indeterminate result does appear, by definition, to mean that some of the findings are abnormal. Mr. Goddard's results were labeled indeterminate, in accordance with CDC interpretation criteria, because the P24 band in the Western Blot test showed reactivity that would normally not appear in a clearly negative result. (Lowden Aff. ¶ 11). Even assuming that plaintiffs are correct that indeterminate results are not particularly unusual, to the extent that one of the bands in this test showed reactivity, there were *abnormal findings* in the analysis of Mr. Goddard's blood that rendered the results inconclusive. (Putland Dep. at 10) ("There was one abnormality there."). Defendants, in reporting these findings, accurately communicated

---

7. Prior to the final pre-trial conference in this case, plaintiffs proffered the report of Preston A. Marx, Ph.D., as an exhibit to support their allegations of negligence. The testimony of Dr. Marx was ruled inadmissible as expert testimony during the final pretrial conference, as Dr. Marx's field of expertise was unrelated to the insurance underwriting industry. Accordingly, any opinion contained in Dr. Marx's report cannot be considered by the court on motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *May v. Dover Elevator Co.*, 845 F.Supp. 377, 378 (E.D.Va.1994) (Expert testimony "that would be inadmissible at trial ... cannot create a genuine dispute as to a material fact."). However, even if the report were admissible, it would not support plaintiffs' allegations. Dr. Marx's report states simply that indeterminate results are not unusual in the medical profession, as tens of thousands of individuals receive indeterminate Western Blot results, and he concludes that insurance coverage should not, therefore, be denied based solely on one indeterminate result. (Marx Report at 3). The report offers no opinion whatsoever as to whether it would be inaccurate or negligent to state that the indeterminate HIV test result, based upon a reactive P24 band in the Western Blot test, reflects "abnormal" findings.

the results to plaintiffs, and absent some admissible evidence to the contrary, cannot be said to have acted negligently or unreasonably on that basis.[8]

3. *There is No Evidence to Support the Allegation that Dr. Feist Communicated to Dr. Putland that Mr. Goddard Was HIV Positive.*

Similarly, plaintiffs have put forth no admissible evidence to support the conclusion that Dr. Feist negligently reported a positive HIV result to Dr. Putland. Dr. Feist expressly denies that he indicated to Dr. Putland that Mr. Goddard's test results were HIV positive. (Feist Aff. ¶ 6). In fact, Dr. Feist stated, under oath, that he advised the Goddards' physician that the results were inconclusive, and that while a detected P24 Band, like that present in the analysis of Mr. Goddard's blood, could indicate the presence of HIV, it could also indicate other conditions. (Feist Aff. ¶ 6).

Dr. Putland stated in his deposition that he could not recall the specifics of his conversation with Dr. Feist regarding Mr. Goddard's test results. (Putland Dep. at 9, 25). However, he did testify that he did not recall Dr. Feist ever stating that the results were positive. (Putland Dep. at 9–10). He also testified that he knew how to interpret the test results faxed to him by Dr. Feist and that he would not have interpreted them to reflect a positive result. (Putland Dep. at 9–10; 25–26). To the contrary, Dr. Putland testified that, after reviewing the results, he told the plaintiffs that there was no reason to be overly concerned. (Putland Dep. at 9–10; 25–26).

■ The only evidence that the plaintiffs have proffered in support of their allegation that Dr. Feist told Dr. Putland that Mr. Goddard was HIV positive is their own testimony that Dr. Putland told them that Dr. Feist made this statement

when the two spoke on the telephone. (Sara Goddard Dep. at 18–20; Johnnie Goddard Dep. at 27–30). However, the Federal Rules of Civil Procedure specifically require that a party opposing a motion for summary judgment put forth admissible evidence, based upon personal knowledge, sufficient to create a genuine issue of material fact. *See* Fed.R.Civ.P. 56; *Evans v. Techs. Serv. Co.,* 80 F.3d 954, 962 (4th Cir.1996). Plaintiffs' testimony that they were told by their physician that Dr. Feist stated that Mr. Goddard was HIV positive is double hearsay and inadmissible under the Federal Rules of Evidence. *See* Fed.R.Evid. 802. As this evidence could not be considered at trial, it cannot be considered by this court in resolving the present motion for summary judgment. *See* Fed.R.Civ.P. 56; *Evans,* 80 F.3d at 962. The only admissible evidence before this court regarding the communication between Drs. Feist and Putland is, therefore, the uncontroverted deposition testimony of Drs. Feist and Putland that neither of them believed or communicated that Mr. Goddard was HIV positive.

4. *Plaintiffs Allege Damages from Negligent Collection and Testing that Were Not Proximately Caused by Defendants' Actions and that Are Not Compensable Under Virginia Law.*

Plaintiffs' final allegations of negligence, those based upon the negligent collection and testing of the blood samples by APPS and LabOne, also fail as a matter of law. The court need not decide whether LabOne or Protective owed the plaintiffs any duty to perform the analysis of Mr. Goddard's blood with reasonable care or what that standard of reasonable care would require in these circumstances. Even assuming that defendants breached some legal duty owing to plaintiffs by failing to

---

8. Interestingly, no report, or any mention, of HIV was made in the December 31, 1997, letter from Dr. Feist to Mr. Goddard. Rather, plaintiffs do not even claim that HIV was ever

mentioned or an issue until they met with their physician, Dr. Putland. *See infra* at 553–54.

collect the samples and conduct the tests with reasonable care, and in accordance with industry standards, it is clear that the damages plaintiffs have alleged were not proximately caused by any actions of the defendants and, furthermore, that those damages are not compensable as a matter of Virginia law.

### a. *Proximate Cause*

The court finds, as a matter of law, that even if there was breach of a legally cognizable duty caused by some negligence in the collection or testing process, the indeterminate result at issue was not the proximate cause of the damages that the plaintiffs allege in this case. The question of proximate cause is generally a question for determination by a jury. *See Huffman v. Sorenson*, 194 Va. 932, 936–37, 76 S.E.2d 183 (1953). Such a determination becomes a matter of law if undisputed facts are susceptible of only one inference. *See Poliquin v. Daniels*, 254 Va. 51, 57, 486 S.E.2d 530 (1997); *Huffman*, 194 Va. at 937, 76 S.E.2d 183. A simplistic "but for" argument does not resolve the proximate cause question under Virginia law. *See Banks v. City of Richmond*, 232 Va. 130, 136, 348 S.E.2d 280 (1986); *Wyatt v. Chesapeake & Potomac Tel. Co.*, 158 Va. 470, 478, 163 S.E. 370 (1932). The proximate cause of an event is that "act or omission which in natural and continuous sequence, unbroken by any efficient intervening cause, produces that event, and without which that event would not have occurred." *Coleman v. Blankenship Oil Corp.*, 221 Va. 124, 131, 267 S.E.2d 143 (1980); *see also Banks v. City of Richmond*, 232 Va. at 135, 348 S.E.2d 280 (1986); *Huffman*, 194 Va. at 934, 76 S.E.2d 183. An injury is proximately caused by a defendant's negligence if it is the natural and probable consequence of the negligence. *See Wyatt*, 158 Va. at 476, 163 S.E. 370; *Banks*, 232 Va. at 135, 348 S.E.2d 280 (citing *Connell's v. Chesapeake*, 93 Va. 44, 59, 24 S.E. 467 (1896)). "The natural and probable consequences are those which human foresight can foresee because they happen so frequently that they may be expected to happen again." *Wyatt*, 158

Va. at 479, 163 S.E. 370. Furthermore, a consequence is only probable if it occurs "according to ordinary and usual experience." *Id.*

A cause of injury may be the proximate cause, notwithstanding that it acted through a series of events, so long as the "events were combined in one continuous chain through which the force of the cause operated" to produce the injury. *Jefferson Hospital v. Van Lear*, 186 Va. 74, 81, 41 S.E.2d 441 (1947). If an intervening cause is not reasonably foreseeable to the wrongdoer, however, that cause will break the causal chain between the initial act of negligence and the damage sustained, so that liability will not attach. *See id.* at 81, 41 S.E.2d 441; *Coleman*, 221 Va. at 131, 267 S.E.2d 143.

It is undisputed from the face of plaintiffs' complaint that the injuries alleged arose from a mistaken belief that Mr. Goddard was HIV positive. Defendants, however, never achieved or reported a positive result. Mr. Goddard's test results were indeterminate. LabOne reported the indeterminate findings to Dr. Feist and Protective, and the admissible evidence before the court on this motion for summary judgment establishes that Dr. Feist reported an indeterminate result to plaintiffs' personal physician. Any belief that the Goddards may have adopted, either because Dr. Putland allegedly stated that Mr. Goddard was believed to be HIV positive or because the Goddards themselves leapt to unfounded conclusions, was not precipitated by the defendants' act in procuring an indeterminate result. Even if, therefore, Mr. Goddard's results were indeterminate because of some negligence by APPS or LabOne in collecting or testing the specimens, that negligence was not the cause of plaintiffs' mistaken belief that Mr. Goddard was HIV positive. That belief was precipitated, not by the negligent production of an indeterminate result, but rather by the superceding negligence of either Dr. Putland in miscommunicating the indeterminate result as positive, or the

rash conclusions leapt to by the plaintiffs themselves.[9]

### b. *Compensable Damages*

In addition, the damages that plaintiffs allege to have suffered as a result of their mistaken belief that Mr. Goddard was HIV positive are not compensable under Virginia law. The general rule in tort cases in Virginia is that damages for emotional distress are not recoverable without an accompanying physical harm or proof of wanton and willful conduct consistent with the intentional infliction of emotional distress. *See Fairfax Hospital v. Curtis*, 254 Va. 437, 445–46, 492 S.E.2d 642 (1997) (citing *Carstensen v. Chrisland Corp.*, 247 Va. 433, 446, 442 S.E.2d 660 (1994); *Sea–Land Serv. Inc. v. O'Neal*, 224 Va. 343, 354, 297 S.E.2d 647 (1982); *Womack v. Eldridge*, 215 Va. 338, 340, 210 S.E.2d 145 (1974)). The Virginia Supreme Court has recognized limited exceptions to this general rule. However, these narrow exceptions have permitted "the recovery of damages for humiliation, embarrassment, and similar harm to feelings, not accompanied by actual physical injury, [only] *where a cause of action existed independently of such harm.*" *Fairfax Hospital*, 254 Va. at 446, 492 S.E.2d 642 (emphasis added).[10]

Plaintiffs' claim is a bare negligence claim, and the damages alleged are primarily, if not entirely, founded in emotional distress:

> As a direct result of the Defendants' actions, Goddard thought that he was dying. He experienced great anxiety and loss of sleep. Goddard's wife and children became estranged from Goddard as they felt betrayed and feared he might give them AIDS. Goddard cried almost continually and uncontrollably,

missed work, suffered loneliness as he now lived alone and in despair, began to drink. He went to two medical doctors who put him on nerve pills. He suffered sleeplessness, fear of impending death, and loneliness. His family and in-laws ostracized him. The plaintiffs and their family suffered humiliation, embarrassment, and endured the pain and constant fear of being detected as an HIV infected family. They suffered unnecessary medical expenses. Plaintiff Sarah who works for a health agency and daily sees the effects of this virus, lived in fear that she had contacted AIDS from a patient and it had spread to her husband. In the alternative, she suffered severe emotional injury, staying in tears thinking her husband had not been faithful to her after eighteen years of marriage. Plaintiff Sarah suffered nightmares. Her medical doctor prescribed nerve pills. Plaintiffs suffered financial injury when the family separated and each spouse was maintaining a separate set of household expenses. (Compl.¶ 75).

Although plaintiffs have alleged that they suffered from headaches and sleeplessness as a consequence of their emotional disturbance, and have put forth evidence that they received treatment and medication with nerve pills, these allegations do not rise to the level of physical injury as contemplated by the Virginia Supreme Court in *Myseros v. Sissler*, 239 Va. 8, 12, 387 S.E.2d 463 (1990). In *Myseros*, the court held that clear and convincing evidence of symptoms or manifestations of physical injury which are not merely symptoms of an underlying emotional disturbance is required. *Id.* For instance, the

---

9. *See supra* note 8.

10. Plaintiffs argue that *Naccash v. Burger*, 223 Va. 406, 416, 290 S.E.2d 825 (1982) (extreme case involving incorrect Tay–Sachs test results given to expectant parents), admits an additional exception to the general rule and permits recovery in the absence of physical injury so long as the damages alleged are not fraudulent. Though *Naccash* does permit a narrow exception to the general rule for recovery of emotional damages in negligence cases, this exception is not nearly so broad as plaintiffs would argue. To the contrary, *Naccash* has been confined by the Supreme Court of Virginia to its particular facts and is inapposite in the present case. *See Myseros v. Sissler*, 239 Va. 8, 9 n. 2, 387 S.E.2d 463 (1990), and discussion thereof, *supra* at 556.

court found that, to the extent that sweating, dizziness, nausea, difficulty in sleeping and breathing, episodes of chest pain, and weight loss were typical symptoms of emotional disturbance, they did not constitute physical injury sufficient to support a claim for negligent infliction of emotional distress under Virginia law. *See id.* at 11, 387 S.E.2d 463.

Moreover, even if this court were to find that the additional living expenses caused by the marital schism were not so inextricably intertwined with plaintiffs' emotional damages as to be non-compensable, the additional expenses plaintiffs have alleged are *de minimus* and fall outside the scope of the two-day window during which the Goddards were awaiting a determinate result. Mrs. Goddard testified that, due to her emotional upset, she and her children spent two weeks living with her sister. (Sara Goddard Dep. at 44). The only expenses plaintiffs have identified that arose from this temporary stay with Mrs. Goddard's sister are the increased cost of the commute and the amount Mrs. Goddard payed for the additional water and electricity expenses her sister incurred as a result of her and the children being in the home. (Sara Goddard Dep. at 44–46). This period of separation did not begin, however, until after plaintiffs had already obtained a negative result, (Sara Goddard Dep. at 22) and, in fact, plaintiffs received a negative result just two days after learning of the indeterminate result and consulting their personal physician. To the extent that the court would be willing to accept that an indeterminate result might lead one to question the individual's HIV status, the uncertainty generated by that result would have been resolved when a determinate result was reached just two days later. Accordingly, any damages plaintiffs sustained as a result of the indeterminate result would, at best, span that period between receipt of the indeterminate result and confirmation of Mr. Goddard's negative HIV status just two days later. Plaintiffs incurred no additional living expenses during those two days, and the emotional trauma, which constitutes by far the greater portion of the damages plaintiffs allege, is not compensable under Virginia law.

## B. *Breach of Implied Warranty*

█ In Count II, plaintiffs allege that defendants impliedly warranted that they would exercise reasonable care, technical skill, and ability in the performance of their services and that this implied warranty was breached by the alleged acts of negligence set forth in Section A above. This claim must fail as a matter of law for two reasons. First, while Virginia law has recognized an implied warranty in the provision of services in the context of construction contracts, plaintiffs have neither identified a contract nor any basis for extending the narrow warranty recognized by the Virginia Supreme Court beyond the context of construction law. The Virginia Supreme Court has held that "[i]n building and construction contracts it is implied that the building shall be erected in a reasonably good and workmanlike manner and when completed shall be reasonably fit for the intended purpose." *Mann v. Clowser,* 190 Va. 887, 901, 59 S.E.2d 78 (1950); *see also Willner v. Woodward,* 201 Va. 104, 108, 109 S.E.2d 132 (1959) ("If defendant did, by his agreement, undertake these obligations [to install a heating and air-conditioning system as part of the home-building contract], then he was charged with the duty to exercise reasonable care, technical skill and ability in the performance of his contract."). Plaintiffs rely on a footnote in a Virginia Circuit Court case for the general proposition that the common-law recognizes implied warranties for personal services. *See Johnson v. Capital Area Permanente Group,* 1993 WL 945935, *3 n. 3 (Cir.Ct.Va. Feb. 1, 1993). However, the cases that the *Johnson* court cited, *Willner* and *Mann,* do not grant the extensive warranty protection for which they are cited, but are confined to the area of architecture and construction contracts. The Virginia Supreme Court has not expanded this doctrine beyond the limited context of these cases, and in the absence

of such authority, this court, likewise, should not so extend.

Moreover, at its base, this claim seems to be no more than a negligence claim dressed up in a contract claim's clothing. Although plaintiffs have been unable to identify any contract, either express or implied, upon which to base the accompanying warranty they seek to impose, plaintiffs attempt to create a contract law basis for the duty to act reasonably that they argue was breached by the alleged negligence of the defendants. However, it is apparent that such a warranty, if it exists, is no more and no less than a negligence standard. In other words, the existence of a warranty, at best, creates a duty; plaintiff retains the burden of proving breach, proximate causation, and compensable damages. *See generally, e.g., Mann,* 190 Va. at 902, 59 S.E.2d 78; *Prasse v. Virginia Power,* 1990 WL 751171, *3 (Cir.Ct. Va., May 29, 1990). In disposing of the negligence action above, therefore, the court similarly disposed of any claims for breach of warranty to render services in a reasonable and workmanlike manner.

## C. *Intentional Infliction of Emotional Distress*

Count III of plaintiffs' complaint asserts a cause of action for intentional infliction of emotional distress against LabOne, Protective, and Dr. Feist on grounds identical to those set forth in plaintiffs' negligence claims against these defendants: (1) the failure of Dr. Feist and Protective to retest and reconsider Mr. Goddard for life insurance coverage; (2) the communication by Dr. Feist and Protective of abnormal findings; (3) the alleged report to Dr. Putland that Mr. Goddard was HIV positive; and (4) the failure to use reasonable care to achieve a determinate result.

To prevail on a claim of intentional infliction of emotional distress under Virginia law, a plaintiff must establish (1) intentional or reckless conduct by the defendant, (2) of an outrageous and intolerable nature, (3) which caused, (4) severe emotional distress to the plaintiffs. *See*

*Womack v. Eldridge,* 215 Va. 338, 342, 210 S.E.2d 145 (1974). "Because injury to the mind or emotions can be easily feigned, intentional infliction of emotional distress is 'not favored' under the law of Virginia." *Dixon v. Denny's, Inc.,* 957 F.Supp. 792, 796 (E.D.Va.1996) (citing *Ruth v. Fletcher,* 237 Va. 366, 377 S.E.2d 412 (1989)). The first element is satisfied where the defendant had the specific purpose of inflicting emotional distress or where the specific conduct was intended and the actor knew or should have known that the emotional distress would likely result. *See Womack,* 215 Va. at 342, 210 S.E.2d 145. The second element is satisfied if the conduct "offends against the generally accepted standards of decency and morality [and] is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Id.* The third element requires a causal connection between the defendants' conduct and the emotional distress. *See id.* The fourth element is satisfied by the type of extreme emotional distress that is so severe that no reasonable person could be expected to endure it. *See Dixon,* 957 F.Supp. at 796.

" 'It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.' " *Womack,* 215 Va. at 342, 210 S.E.2d 145 (citing *Restatement (Second) of Torts* § 46). A court must grant summary judgment in favor of the defendants if, when viewing a defendants' conduct in light of all the facts in the record, the court determines that the conduct does not rise to such an outrageous or extreme level as to offend generally accepted standards of decency and morality. *See Coppage v. Mann,* 906 F.Supp. 1025, 1049–50 (E.D.Va.1995). At a threshold level, none of defendants' conduct rises to this level conduct within the scope of Virginia law. Defendants were under no obligation to retest and reconsider the coverage decision upon learning that Mr. Goddard had received subse-

quent negative results. Mr. Goddard's blood tests produced an indeterminate HIV result, which under Protective's underwriting policies, precluded issuing coverage until Mr. Goddard could be retested six months from the initial result. Defendants' letter denying coverage accurately communicated that Mr. Goddard's tests produced some abnormal findings. The clear intent of the letter was not to cause plaintiffs emotional distress, but rather to explain the basis for the denial of coverage and accurately communicate the results of the tests so that plaintiffs might proceed with additional clinical evaluation from a healthcare provider. As set forth in Section A above, plaintiffs have put forth no admissible evidence that would suggest "that any of the defendants ever stated that the results showed that Mr. Goddard was HIV positive. The results produced inconclusive findings, and the defendants reported these results accurately. If, indeed, the results were inconclusive because APPS and LabOne acted negligently or failed to comply with industry standards in collecting and analyzing the specimens, defendants conduct would be negligent at most.[11] Under Virginia law, however, "mere professional negligence is not sufficiently extreme and outrageous to give rise to this unfavored tort." *Coppage v. Mann,* 906 F.Supp. 1025, 1049–50 (E.D.Va.1995) (citing *Timms v. Rosenblum,* 713 F.Supp. 948 (E.D.Va.1989), *aff'd,* 900 F.2d 256, 1990 WL 48915 (4th Cir.1990)).

Moreover, an action for intentional infliction of emotional distress will lie only where the defendants' conduct causes emotional distress so severe that no reasonable person could be expected to endure it. *See Dixon,* 957 F.Supp. at 796. As set forth above, the defendants did not, at any time, state or even suggest that Mr. Goddard was HIV positive. The blood test conducted by defendants were indeterminate for HIV, in accordance with CDC interpretation criteria, and defendants' accurately communicated this result to plaintiffs. Even assuming that some negligence of the defendants caused the results to be inconclusive rather than clearly negative, defendants conduct caused the plaintiffs to endure, at most, two days of uncertainty about Mr. Goddard's HIV status. While such uncertainty may be emotionally upsetting, it fails to rise to the level of severe emotional distress necessary to support a claim of intentional infliction of emotional distress under Virginia law.

### D. *Defamation*

Count IV of plaintiffs' complaint asserts a cause of action for defamation against Protective and Dr. Feist for publication of the non-specific code for an indeterminate result with the MIB. Following the initiation of summary judgment proceedings, however, plaintiffs have attempted to reframe their position and now argue that the alleged defamation stems not from the original reporting of the non-specific code, but rather from the failure to delete Mr. Goddard's MIB code after notification that he had received subsequent negative HIV results. Plaintiffs' defamation claim, whether arising from the initial publication or from the failure to delete the code, must fail as a matter of law. First, the defendants' report to the MIB is statutorily immunized in Virginia from any action in the nature of defamation. Moreover, even absent statutory immunity, plaintiffs' allegations are insufficient, as a matter of law, to satisfy the prima facie case for defamation under Virginia law, as the reported findings were indisputably true.[12]

---

11. The court, however, makes no finding as to whether the samples were collected or tested in accordance with industry standards of reasonableness, but grants summary judgment in favor of the defendants on these allegations of negligence on the basis that plaintiffs' damages were not, as a matter of law, proximately caused by defendants' actions or compensable under Virginia law. *See supra* at 553–56.

12. The court also notes that plaintiffs signed an express authorization for the publication with the MIB. Although there is no binding Virginia precedent holding that consent acts as a complete defense to defamation, consent is, under general principles of tort law, an absolute defense. "[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his ac-

### 1. *Defendants' Report Was Statutorily Immune from Liability.*

██ Virginia Code § 38.2–618 provides for limited immunity from liability for the disclosure of certain insurance-related information:

No cause of action in the nature of defamation, invasion of privacy, or negligence may arise against any person for disclosing personal or privileged information in accordance with this chapter, nor shall such a cause of action arise against any person for furnishing personal or privileged information to an insurance institution, agent or insurance support organization[13]. However, this section shall provide no immunity for disclosing or furnishing false information with malice or willful intent to injure any person.

To the extent that plaintiffs' defamation claim relies upon the original publication of the non-specific code for Mr. Goddard's indeterminate result with the MIB, the publication is protected under the plain language of the statute. The statute expressly provides for immunity from suit in the nature of defamation for the disclosure of personal information to an insurance support organization in these circumstances. As the information disclosed accurately reflected the results of Mr. Goddard's HIV test and plaintiffs have put forth no evidence suggesting that Protective or Dr. Feist acted with malice or a willful intent to cause them injury in making the disclosure to the MIB, the initial publication is statutorily protected from plaintiffs' defamation cause of action.

When plaintiffs alter their theory of liability to defamation stemming from defendants' failure to delete Mr. Goddard's MIB code after receiving notice of the subsequent negative test results, plaintiffs attempt to remove their claim from the ambit of the statute by reframing the claim to arise, not from the initial "furnishing" of personal information, but rather from the failure to remove inaccurate personal information. However, plaintiffs' alternative argument is no more availing than the argument as originally framed. First, there is no authority under which defendants may be held liable in defamation for failing to withdraw a statement that they had been statutorily protected in making in the first instance. Mr. Goddard's subsequent negative results do not undermine the truth of defendants' report to the MIB that the results of the tests conducted on behalf of Protective were indeterminate. Mr. Goddard did, in fact, receive an indeterminate result on the December test. That statement does not become false merely because Mr. Goddard later received negative results.

Secondly, defendants' responsibility to correct any "incorrect" information is statutorily governed, and defendants fully complied with the statutory requirements. Virginia Code § 38.2–609, titled "Correction, Amendment, or Deletion of Recorded Personal Information," provides that "within thirty business days from the date of receipt of a written request from an individual to correct, amend, or delete any recorded personal information about the individual within its possession, an insurance institution, agent, or support organization shall" either correct the portion of the information that is in dispute, or notify the individual of the reasons for a refusal to correct the information. Plaintiffs assert that defendants, after receiving telephone notification from Mrs. Goddard that new test results had shown a clear negative result for HIV, should have changed

---

tion for defamation." *Restatement (Second) of Torts* § 583 (1977). "The general social policy of denying recovery for conduct to which the plaintiff has given his consent finds expression in an absolute immunity in cases where consent is given to defamation." *Prosser & Keeton on Torts* § 114 (1984).

**13.** An insurance support organization is any person who regularly engages, in whole or in part, in the practice of assembling or collecting information about natural persons for the primary purpose of providing information to an insurance institution or agent for insurance transactions. *See* Va.Code § 38.2–602 (Definitions).

the designation with the MIB. The statute, however, requires a written request to correct. *See* Va.Code § 38.2–609. Mrs. Goddard testified during her deposition that other than the test results which she faxed to Dr. Feist in July, 1998, she never sent any written correspondence to Protective or Dr. Feist. (Sara Goddard Dep. at 30–31). Plaintiffs are bound by this testimony. *See Roche v. John Hancock Mutual Life Ins. Co.,* 81 F.3d 249, 251 (1st Cir. 1996) ("Motions for summary judgment must be decided on the record as it stands....").

On receiving the appropriate written notification, defendants acted without delay to assuage plaintiffs' concerns and correct any misinformation. On July 9, 1998, immediately after receiving notice from the MIB of plaintiffs' objection to the non-specific code reflected in their file, Dr. Feist spoke to Mrs. Goddard. At the request of Dr. Feist, Mrs. Goddard forwarded to Protective copies of the three subsequent test results reflecting that Mr. Goddard was HIV negative. On July 23, 1998, Dr. Feist wrote to the MIB and requested that the MIB code be deleted on the basis of these results. Accordingly, Protective and Dr. Feist fully complied with the statute governing correction of misinformation in the insurance industry and cannot be held liable in defamation for acts specifically provided for by statute.

### 2. *Plaintiffs Have Not Stated A Prima Facie Defamation Case.*

■ Even if, however, defendants were not statutorily protected from liability for defamation, plaintiffs' claim fails to satisfy a prima facie case for defamation under Virginia law. In Virginia, a claim for defamation requires proof (1) of publication, (2) of a defamatory statement, (3) which the defendant either knew to be false or, believing it to be true, lacked reasonable grounds for such belief or acted negligently in failing to ascertain the truth.

*See Food Lion, Inc. v. Melton,* 250 Va. 144, 150, 458 S.E.2d 580 (1995). The determination of whether a statement is actionable is a matter of law. *See, e.g., Wilder v. Johnson Pub. Co., Inc.,* 551 F.Supp. 622 (E.D.Va.1982); *Chaves v. Johnson,* 230 Va. 112, 335 S.E.2d 97 (1985); Restatement (Second) of Torts § 614 (1977). To be actionable as defamatory, plaintiffs must prove by a preponderance of the evidence that the statement is false. *See Food Lion, Inc.,* 250 Va. at 150, 458 S.E.2d 580; *Gazette v. Harris,* 229 Va. 1, 8, 325 S.E.2d 713 (1985). In effect, truth acts as an absolute defense to any defamation.

■ Whether plaintiffs' cause of action rests upon the initial publication of the non-specific code or the failure to retract the code, plaintiffs' cause of action must fail under these standards. It is uncontroverted that, at the time of publication, Mr. Goddard had received an indeterminate result covered by the non-specific code posted with the MIB. Plaintiffs clearly cannot base a successful defamation claim on this initial, true publication.

Alternatively, plaintiffs argue that, even if the *initial* publication was true, the non-specific code was republished every time it was viewed by a new individual or insurance company.[14] Therefore, at some point after the subsequent negative test results were received, the defendants caused to be published, to some person, the statement that Mr. Goddard was indeterminate for HIV, when, in fact, he had received a determinate negative result. Plaintiffs' attempt to recharacterize the claim as a failure to retract, however, it is nothing more than an end-run around the requirements of defamation, and it obscures the nature of the publication. Whether the code was viewed by one individual or one hundred, it is a single publication. *See Morrissey v. William Morrow & Co., Inc.,* 739 F.2d 962, 967 (4th Cir.1984); Restatement (Second) of Torts

---

**14.** Though the substance of plaintiffs' argument is not set forth in plaintiffs' memoranda, plaintiffs relied upon this theory of liability during oral argument on the present motion for summary judgment.

§ 577A(4) (1977). It is uncontroverted that, at the time the publication was made, it was, in fact, a true statement; Mr. Goddard did receive an indeterminate HIV test result in December, 1997. That later tests produced different results in no way undermines the truth of that statement. There simply is no authority for the proposition advanced by plaintiffs that failure to retract a statement that was indisputably true when reported becomes defamation when circumstances change or new developments occur.

### IV. Conclusion

For the reasons stated above, defendants' motions for summary judgment are **GRANTED,** and all of plaintiffs' claims are hereby **DISMISSED.** In summary, the court finds that plaintiffs' negligence claims must fail as a matter of law as: (1) Dr. Feist and Protective owed plaintiffs no duty to retest Mr. Goddard and reconsider its underwriting decision upon learning of the subsequent negative results and receiving the plaintiffs' request for retesting; (2) plaintiffs have put forth no admissible evidence to establish that it was unreasonable or negligent for Dr. Feist and Protective to report the indeterminate result as an "abnormal" finding; (3) plaintiffs have put forth no admissible evidence to support their allegation that Dr. Feist communicated to Dr. Putland, the plaintiffs' personal physician, that Mr. Goddard was HIV positive; and (4) even assuming that both APPS and LabOne owed plaintiffs a duty of reasonable care that was breached by negligent handling and testing of Mr. Goddard's blood sample, and that Protective and Dr. Feist were the principals of these independent contractors, plaintiffs' damages were neither proximately caused by the defendants' actions nor compensable under Virginia law. Plaintiffs' claim of breach of implied warranty fails because it is not legally applicable to negligence claims and plaintiffs have stated no contract claims to which it applies. Plaintiffs' intentional infliction of emotional distress claim fails because neither defendants' alleged conduct, nor the alleged damages, meet the legal standard to sustain this claim. Plaintiffs' defamation claim fails as defendants' report was statutorily immune from liability and plaintiffs have not stated a prima facie case of defamation.

The Clerk is **DIRECTED** to send a copy of this Opinion and Final Order to counsel for all parties.

IT IS SO **ORDERED.**